Filed 6/24/22; Modified and Certified for Partial Publication 7/15/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DERION DAVON LEE et al.,<br><br>Defendants and Appellants. | B300756, B305493<br>(Los Angeles County<br>Super. Ct. No. GA101244) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge.  Affirmed and remanded with directions.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Derion Davon Lee.

Dwyer + Kim, John P. Dwyer; Spolin Law and Aaron Spolin, under appointment by the Court of Appeal, for Defendant and Appellant Pernell Barnes.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Charod Robinson.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellants Derion Devon Lee, Charod Robinson, and Pernell Barnes, members of the Duarte Duroc Crips gang (DDC), were convicted of various charges arising from two shootings that occurred as part of a war between DDC and a rival gang, the Pasadena Denver Lane Bloods (PDL).  The first shooting (the Douglas shooting) occurred on December 22, 2016, at the Kings Villages apartment complex in Pasadena, a known PDL hangout, and resulted in the killing of Brandon Douglas, a PDL associate.  The second shooting (the Vigil shooting) occurred on January 6, 2017, during a candlelight vigil held for Douglas at Kings Villages.  Ormoni Duncan and Antoine Sutphen were killed, and Janell Lipkin and Shamark Wright were wounded.  Just hours before the Vigil shooting, someone had opened fire on a residence in DDC's territory in Duarte (the Duarte shooting).

Appellants were tried along with two codefendants, Isaiah Daniels and Andrew Vasquez, also members of DDC.  Appellant Lee was the only person charged in connection with both the Douglas and Vigil shootings.  The others were charged only with crimes arising out of the Vigil shooting.

As to the Vigil shooting, the jury convicted appellants Lee, Robinson, and Barnes of one count of conspiracy to commit murder (Pen. Code, § 182,

2

subd. (a)(1); count 1);[1] two counts of first degree murder (§ 187, subd. (a); counts 2-3) for the killings of Sutphen and Duncan; two counts of attempted willful, deliberate, and premeditated murder (§§ 664/187, subd. (a); counts 4, 9) for the wounding of Lipkin and Wright; and shooting at an inhabited dwelling (§ 246; count 5). As to the Douglas shooting, the jury convicted appellant Lee of an additional count of first degree murder (§ 187, subd. (a); count 6) for the killing of Douglas. Further, on all counts as to all appellants, the jury found true special circumstance allegations (§ 190.2, subds. (a)(3) [multiple murder], (a)(21) [drive-by murder], (a)(22) [gang murder]) on counts 2, 3, and 6, as well as gang allegations (§ 186.22, subd. (b)(1)(C)) and gang-related firearm allegations (§ 12022.53, subds. (b)-(d)/(e)(1)).[2]

In bifurcated proceedings, appellants Lee, Robinson, and Barnes each admitted they had suffered prior serious or violent felony convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(j), 1170.12). Appellants Lee, Robinson, and Barnes were each sentenced to three consecutive terms of life imprisonment without the possibility of parole (LWOP) plus 25 years to life on counts 2 and 3, and life imprisonment plus 25 years to life on counts 4 and 9.[3] On count 5, appellants Robinson and Barnes

---

[1]    Unspecified references to statutes are to the Penal Code.

[2]    As to appellant Lee, the verdict form on count 6 (first degree murder of Douglas) omitted the drive-by murder special circumstance under subdivision (a)(21) of section 190.2. As to all three appellants, the verdict forms on count 5 (shooting at an inhabited dwelling) listed one firearm enhancement under subdivision (d)/(e)(1) of section 12022.53, which the jury found true.
        Defendant Daniels was also charged with and convicted of counts 1 through 5, and 9. Defendant Vasquez was acquitted of all charges.

[3]    Appellant Lee was also sentenced to consecutive terms of five years for a prior serious felony conviction (§ 667, subd. (a)(1)) on counts 4 and 9.

were sentenced to consecutive terms of seven years imprisonment; appellant Lee was sentenced to a consecutive term of 25 years imprisonment. On count 1, the court imposed and stayed (§ 654) various terms of imprisonment based on the underlying offense and firearm allegations that were found to be true. Appellant Lee was also sentenced on count 6 to two consecutive LWOP terms plus 25 years to life. The court imposed victim restitution, and imposed and stayed various fines, fees, and assessments subject to an ability to pay hearing.

In his opening brief, appellant Lee contends: (1) the trial court erred by excluding evidence of third-party culpability with respect to both shootings; (2) insufficient evidence supported the kill zone instruction on both counts of attempted murder; (3) insufficient evidence supported a finding that appellant conspired with the codefendants to commit murder; (4) the court made various evidentiary errors, including admitting evidence of his gang membership, one text message he sent to appellant Robinson, appellant Lee's Google searches, statements the codefendants made following the shootings, and records obtained from the social media accounts of codefendant Daniels, and appellants Robinson and Barnes; (5) the court abused its discretion by denying appellant Lee's oral motion to continue the trial; and (6) the cumulative effect of the foregoing errors requires reversal. In their opening briefs and through notices of joinder, appellants Robinson and Barnes join in all but one of appellant Lee's contentions.

---

Appellant Robinson was sentenced to an additional five-year term under section 667, subdivision (a)(1), on count 4.

4

We conclude that the trial court erred by instructing the jury on the kill zone theory of attempted murder, but find the error harmless. We reject the remaining contentions.

All three appellants also raise various sentencing issues. While this appeal was pending, Assembly Bill No. 333 (Stats. 2021, ch. 669, §§ 1-5) (A.B. 333) and Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) (S.B. 567) became effective. A.B. 333 amended the gang enhancement statute (§ 186.22) to impose additional elements beyond those that were required at the time of trial. A.B. 333 also enacted section 1109, which provides in relevant part for the bifurcation of trial, upon the defendant's request, of the gang enhancement allegations charged under section 186.22, subdivision (b).

S.B. 567 amended section 1170, subdivision (b), to require imposition of the middle term of imprisonment for crimes with a sentencing triad unless circumstances in aggravation justify imposition of a greater sentence, and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at a jury or court trial.[4]

We agree that the trial court committed several sentencing errors, but otherwise reject appellants' arguments. We vacate the true findings and strike the sentences imposed under sections 186.22, subdivision (b), 190.2,

---

[4] Appellants Robinson and Barnes have filed notices of joinder in this appeal. In those notices, appellants Robinson and Barnes join the arguments made in appellant Lee's opening brief and purport to join in arguments made by codefendant Daniels in his separate appeal. Because codefendant Daniels's appeal has not been consolidated with this appeal and is not presently before this court, we deem the purported notices of joinder in codefendant Daniels's contentions ineffectual.

subdivision (a)(22), and 12022.53, subdivisions (b)-(d)/(e)(1), and remand the matter to afford the People the opportunity to retry these allegations in conformance with the current law. We also vacate the sentences imposed on counts 5 and remand for resentencing. We direct the trial court to correct the abstracts of judgment and sentencing minute orders. In all other respects, we affirm the judgments of conviction.

## BACKGROUND

A.    *Prosecution Evidence*

    I.    *Overview*

According to Los Angeles Sheriff's Detective Matthew Thomas, an expert on DDC, appellants and their codefendants were members of DDC, whose primary territory is in the City of Duarte. Among other names, appellant Lee was known by the moniker "TS." Appellant Barnes was known as "Killa P," and appellant Robinson as "Pac Man." Between 2016 and 2017, DDC was at war with PDL, whose primary territory is located west of Duarte in the City of Pasadena.

PDL gang members were known to congregate around two apartment complexes in Pasadena, one of which was the Kings Villages, the site of both the Douglas and Vigil shootings. Detective Thomas considered the shootings to be acts of retaliation by DDC against PDL.

As part of the investigation of the two shootings, officers extracted cellular phone data and obtained geographic locations (pursuant to search warrants) from cellular phones belonging to

6

appellants and their codefendants;[5] records from Facebook and Instagram for the social media accounts of appellants Robinson and Barnes and defendant Daniels; and records pertaining to appellant Lee's Google subscriber account. We discuss this evidence as relevant in the chronology of events regarding the two shootings.

II.     *The Douglas Shooting (December 22, 2016)*

Around 9:47 p.m. on December 22, 2016, Pasadena Police Department Officers Lerry Esparza and Aaron Villicana responded to a report of a shooting at Kings Villages in the 1200 block of Fair Oaks Avenue. The officers found Brandon Douglas lying on the sidewalk in a pool of blood. He was wearing a red hat and red shoes, the signature color of Bloods gangs like PDL.[6] Douglas's friend, Leonard Howard, testified that Douglas associated with Bloods gang members, including Howard himself. Douglas died from multiple gunshot wounds.

Forensic specialist Katie Sullivan collected five .40 caliber cartridge cases from the scene. After analyzing the casings, senior criminalist Amanda Davis concluded they had been fired from the same firearm. Davis also analyzed six projectiles (five fired bullets and one bullet fragment) collected from Douglas's body, and concluded that two firearms had been used during

---

[5]     Officers from the Pasadena Police Department were able to extract data from only 4 of the 23 different phones processed in this case. The geographic locations obtained from historical cell site analyses was provided through exhibits and testimony from FBI Special Agent Edwin Nam. We have independently reviewed the trial exhibits of the cell site analysis and cell phone data, and summarize the facts as relevant to those exhibits.

[6]     Detective Thomas testified that an individual wearing a red hat and red shoes would be perceived as a Bloods gang member.

the shooting. She identified the first firearm as a .38 special or .357 magnum revolver, and the second as a .40 caliber Smith & Wesson or .10 millimeter automatic handgun.

Appellant Lee's Google account showed that on December 6, 2016 (16 days before the Douglas shooting) appellant Lee searched the internet for "man shot in Duarte" (Duarte being DDC territory). Three days later, on December 9, 2016, appellant Lee twice searched for directions to the "King Manor Apartments" in Pasadena. "Kings Manor" was another name by which Kings Villages, the site of the Douglas shooting on December 22, 2016, was known. Appellant Lee then visited the Facebook page for the apartment complex.

The week following these searches, on December 13 and 15, 2016, appellant Barnes received two Facebook messages indicating that a named PDL gang member (not Douglas) was "homework," and that DDC needed a "k." According to Detective Thomas, a "k" refers to a kill.

A historical cell site analysis of appellant Lee's cell phone activity on December 22, 2016 (the date of the Douglas shooting), showed the following. Before the shooting, between 7:15 and 8:03 p.m., appellant Lee's phone used a cellular tower in Duarte (the Meridian Street tower) covering a southwest sector of the city. By 8:48 p.m., still before the shooting, appellant Lee's phone had moved from Duarte to Pasadena, using a cellular tower just south and east of 1277 Fair Oaks Avenue in Pasadena. This position placed the phone approximately 1,000 meters away from the scene of the Douglas shooting at Kings Villages. At 9:52 p.m., minutes after the shooting was reported to the police around 9:47 p.m., appellant Lee's phone was still in Pasadena, using another tower covering an area south and east of Kings

8

Villages. Later, at 10:17 p.m., appellant Lee's phone used the Meridian Street tower covering a northwest portion of Duarte.

According to appellant Lee's Google account, at 11:28 p.m., less than two hours after the shooting, he visited the Pasadena Star News website. At the time, the police had yet to inform the public about the Douglas shooting.

### III.    *The Duarte Shooting (January 6, 2017, 9:00 p.m.)*

Around 9:00 p.m. on January 6, 2017, Los Angeles Sheriff's Deputy Roman Krajewski responded to the scene of a residential shooting in DDC territory at 2080 Goodall Avenue in Duarte. Krajewski observed several bullet holes in the home's front window and in a vehicle sitting in the driveway. No one was injured in the shooting.

### IV.    *Cell Phone Evidence After the Duarte Shooting (January 6, 2017, 9:05 p.m. to 11:54 p.m.)*

Cell phone data showed that at 9:05 p.m., minutes after the Duarte shooting was reported, defendant Daniels's cell phone used the Meridian Street tower in Duarte, and then used towers consistent with travel north of Meridian Street toward interstate 210, and westward travel along the highway between 9:07 p.m. and 9:14 p.m. toward Pasadena. During that period of time, defendant Daniels made or received calls or standard text messages from appellants Barnes and Lee (whose phone at the time was located in La Verne).[7] At 9:09 p.m., appellant Lee sent a standard text message to appellant Barnes.

---

[7]    The cellphone data lists outgoing and incoming calls and standard text messages in Coordinated Universal Time (UTC). Special Agent Nam testified that UTC time is converted to Pacific Standard Time by subtracting eight hours.

9

As defendant Daniels moved around Pasadena between 9:15 p.m. and 10:26 p.m., he made or received phone calls or standard text messages from appellant Barnes (whose phone used the Meridian Street tower in Duarte) and appellant Robinson (whose phone also used the Meridian Street tower). At 9:28 p.m., appellant Barnes made an outgoing call to appellant Lee (whose phone at the time was still located in La Verne).

Around 11:00 p.m., the phones of defendant Daniels and appellants Robinson and Lee used the Meridian Street tower. Appellant Barnes's phone used the Meridian Street tower around 11:24 p.m.[8] Then, between 11:26 and 11:27 p.m.—the last time his phone used a cellular tower on January 6, 2017—appellant Lee's phone used towers located along interstate 210 consistent with westward movement from Duarte toward Pasadena. At 11:34 p.m., appellant Robinson's phone used a cellular tower along interstate 210 in Pasadena serving an area north of the highway (a coverage area near the site of the Vigil shooting). Between 11:43 and 11:51 p.m., appellant Barnes's phone used a cellular tower in Pasadena covering 87 West Claremont Street.

The Vigil shooting occurred at 87 West Claremont Street at or shortly before 11:51 p.m. The address 87 West Claremont is part of the Kings Villages complex that is positioned between Fair Oaks Avenue and Sunset Avenue.

---

[8]     Detective Thomas testified that gang members "usually congregate and communicate, if they are not together, by cellphone, by text messages, determine a place to meet, which is commonly one of the gang hangouts . . . , several locations on Goodall Avenue, and in my experience, I know they have been used as locations to congregate, formulate plans, and then from there, go on what is called a 'mission.'"

V.    *The Vigil Shooting (January 6, 2017, 11:51 p.m.)*

On the evening of January 6, 2017, a candlelight vigil was held for Brandon Douglas at the Kings Villages complex.  It began at a location on Fair Oaks in Pasadena, and later some participants moved to 87 West Claremont, the location to which police responded after receiving the 11:51 p.m. report of a shooting.

Janell Lipkin (one of the two attempted murder victims in the shooting) arrived at the vigil on Fair Oaks sometime after 9:30 p.m.  There, she saw the people who would later become the remaining victims in the Vigil shooting: the other attempted murder victim, Shamark Wright, and the two murder victims, Antoine Sutphen (also known as "Mudder") and Ormoni Duncan. Also present was a man Janell knew only as Khy, as well as Lawana Lipkin (Janell's sister), Leonard Howard (Douglas's friend who provided information in the Douglas murder investigation), and Larinisha Fernandez.

The witnesses at trial provided different perspectives of the events of the shooting.

a.    *Kennard Crawford*

Shortly before the shooting, Kennard Crawford, who had not attended the vigil, was walking his blue bicycle northbound on Fair Oaks Avenue after passing Claremont Street, when a car resembling a Honda Accord pulled up next to him.  An African-American man inside the car "banged on him," stating, "What's up cuz?" (a question used by Crips gang members to acknowledge one another).  The person in the front passenger's seat was wearing a blue bandana on his face.  The car drove away westbound on Claremont Avenue in the direction of Kings Villages.  Scared, Crawford called 911 to report the presence of gang members.  Within minutes, Crawford

11

heard gunshots, after which a police dispatcher called to make sure Crawford was safely at home.

b.      *Larinisha Fernandez*

As shown by the evidence at trial, a sidewalk and metal fence are located on the north side of West Claremont Avenue at the section of Kings Villages that includes 87 West Claremont.  Between the north sidewalk and apartment buildings is a grassy area with trees.  A concrete walkway connecting the sidewalk to the apartment buildings bisects the metal gate and grassy area, and continues north from the buildings to a parking lot.

Larinisha Fernandez testified that she hung out at Kings Manor, had gone to school with Douglas and Duncan, and associated with PDL and other Bloods gangs.  Fernandez attended the candlelight vigil for Douglas, which was initially held on Fair Oaks and later moved to the complex at 87 West Claremont.  While sitting in her parked car with a friend on Claremont Avenue, Fernandez saw two cars approaching from Fair Oaks Avenue.  The first car resembled a black truck or van; the second car resembled a four-door Honda.  The cars approached with their front lights turned off.  Fernandez stayed inside the car and covered herself as "a lot" of shots were fired.

c.      *Janell Lipkin*

Janell Lipkin testified that she was standing in the grassy area of the apartment complex near a tall, slanted tree when she saw four-to-five Black men inside a sport utility vehicle in the middle of Claremont Avenue.  The men started shooting as a second car pulled up behind them.  Janell dove to the grass and saw bullets strike the ground.  During the shooting, a man in the second car yelled out "[f]uck slobs" (the term "slobs" being, according to

12

Detective Thomas, a derogatory term that DDC gang members use to refer to PDL members). Both vehicles drove away toward Sunset Avenue. Janell sustained gunshot wounds to her legs, lung, kidney, and back.

### d. *Leonard Howard*

Leonard Howard testified that he, Antoine Sutphen, and Ormoni Duncan were, like Janell, standing next to a tall, slanted tree when the shooting commenced. Howard saw a few cars driving slowly on Claremont Avenue before one person in the last car began shooting. In response, Howard ran around the corner of one of the apartment buildings. When the shooting stopped, Howard looked back and saw that Duncan had been shot in the neck. Howard also saw Sutphen and Janell lying on the ground. Howard went over and held Sutphen in his arms until paramedics arrived.[9] Sutphen died from a single bullet that penetrated his back, lung, and heart, and exited through his chest.

### e. *Shamark Wright*

Shamark Wright testified that he had seen Sutphen, Duncan, Lawana Lipkin, the man named Khy, and another man named Dijon at the relocated vigil on 87 Claremont Avenue. While standing near the concrete walkway behind a slanted tree, Wright heard someone say, "get down." When he hit the ground, Wright heard different tempos of gunshots. Sutphen was on the

---

[9] While waiting for the paramedics, Howard discarded a .25-caliber firearm he had been carrying. Officers collected the firearm and a .9 millimeter Ruger from the scene. Both firearms were non-operable and were later excluded as candidates responsible for firing cartridge cases collected at the scene.

ground two feet away from him. As soon as the shooting stopped, Wright ran toward the back of the apartment complex and parking lot, at which time he realized he had been shot in the leg. He then saw Lawana's car approaching.

### f. *Lawana Lipkin*

While walking to her parked car north of the apartment complex, Lawana Lipkin heard gunshots. She began driving away, but stopped after seeing Wright and Duncan (both of whom had been wounded) running toward her. Duncan got into the front passenger seat. Wright got into the rear seat along with Khy and Dijon. Duncan had been shot in the neck and was thrashing about inside the car. As Lawana was driving toward a local hospital, Duncan jumped into the backseat. As he did so, he kicked the car out of drive, and Lawana lost control. The car crashed into a tree. Investigators later found Duncan's body on the right front passenger floorboard. He died from a single gunshot wound to the neck.

### VI. *Video Evidence After the Vigil Shooting (January 6, 2017, 11:52 p.m.)*

Investigating officers obtained video surveillance from businesses located along the Lincoln Avenue corridor, which is approximately one mile northwest of 87 West Claremont Avenue. In close proximity to the intersection of Lincoln Avenue and Howard Street is an onramp to eastbound interstate 210 from Howard Street. If driving north on Lincoln Avenue, a car must turn left onto Howard Street before turning right onto the highway onramp.

In footage shown to the jury, around 11:52 p.m. on January 6, 2017 (one minute after police received a shots-fired call), three cars

were recorded traveling northbound on Lincoln Avenue in the direction of Howard Street. One of the vehicles—a tan four-door sedan—turned left against a red light at the intersection of Lincoln Avenue and Howard Street.

VII. *Cell Phone Evidence After the Vigil Shooting (January 6-7, 2017, 11:52 p.m.–12:06 a.m.)*

Between 11:52 p.m. and 11:53 p.m. (the same time the tan four-door vehicle was captured on video), the cell phones of defendant Daniels and appellant Barnes used a cellular tower covering the intersection of Lincoln Avenue and Howard Street. The cell phones of defendant Daniels and appellants Barnes and Robinson used cellular towers consistent with eastward movement along interstate 210 from Pasadena toward Duarte between 11:54 p.m. and 11:56 p.m. At 11:54 p.m., and while both phones used cell towers located in Pasadena, defendant Daniels's phone made an outgoing call or sent a standard text message to appellant Robinson's phone.

Beginning around 12:00 a.m. January 7, 2017, the phones of appellants Robinson and Barnes, and that of defendant Daniels, used cellular towers in Duarte. Then, between 2:00 a.m. and 2:28 a.m., the phones of appellants Lee and Robinson, and that of defendant Daniels, used the same two cellular towers covering areas in Fullerton.

VIII. *Google Evidence After the Vigil Shooting (January 7-30, 2017)*

On January 7, 2017, appellant Lee entered Google searches for "Pasadena shooting this morning," and "Duarte shooting Goodall Avenue" (the Duarte shooting). On January 9, 2017, he searched Google for, inter alia, "Glock 19 cleaning and lubrication"; and on January 30, 2017, he entered

various searches for maintaining and replacing parts on Glock firearms (which we discuss in more detail below).

IX. *Crime Scene Investigation of the Vigil Shooting*

Forensic specialists Katie Sullivan (who had investigated the Douglas shooting) and Alex Padilla responded to the scene and collected over 20 fired cartridge cases, the majority of which were found underneath a parked car on the north side of 87 West Claremont Avenue.[10] Several of the cases collected from the street and underneath the car were .40 caliber and .9 millimeter. The specialists also collected several .9 millimeter cartridge cases from the interior and exterior of the apartment complex.

Multiple projectiles (spent bullets and fragments) were collected from the scene. Bullet strike marks were found on the exterior wall of an apartment building, a tree located in the grassy area, and the south-facing side of the metal fence.

Based on groupings of collected cartridge cases, senior criminalist April Whitehead concluded that five different firearms had been used during the shooting, including one .40 caliber Smith & Wesson firearm, one .45 caliber firearm, and three .9 millimeter firearms. One grouping of .9 millimeter cases was consistent with being fired from a Glock handgun.

X. *Ballistic Evidence Connecting Both Shootings*

Senior criminalist Davis compared a .40 caliber cartridge case collected at the Douglas shooting to the same caliber case collected from the Vigil shooting. She determined that the same .40 caliber firearm had been used

---

[10] Sullivan observed strike marks and damage to the car.

during both shootings, a finding later confirmed after senior criminalist Davis compared projectile evidence from both scenes.

XI.    *Appellants' and Their Codefendants' Subsequent Conduct*

On January 14, 2017, appellant Robinson sent another Facebook subscriber a direct message wherein he stated, "We are goin at it wit [*sic*] the Lanes [a reference to PDL] though. . . . We made history." Detective Thomas testified that the statement "we made history" was made in reference to DDC's enhanced status in the community.

In March 2017, investigating officers obtained court approval to wiretap the phones of appellants and their codefendants. Recordings of various monitored phone conversations were played for the jury. During a March 18, 2017 conversation, defendant Daniels asked appellant Lee if he was "trynna rock." Appellant Lee replied, "Yep, if you put in some work before then." Defendant Daniels stated, "Man, you got me fucked up," to which appellant Lee replied, "[y]ou got yourself fucked up nigga." He continued, stating, "You got the set fucked up." Defendant Daniels responded, "no, the set got me fucked up, my nigga. [¶] . . . [¶] The set must don't kn-, I'm the last nigga that ever hit some cheesies nigga."[11] Appellant Lee stated, "So, we ain't talkin' about them right now," and "niggas been layin' down." He continued, "niggas ain't doin' nothin' no more. [¶] . . . [¶] Yeah, well, it's up to us to finish doin' shit then." Appellant Lee stated that "if we ain't applyin' no pressure they ain't gonna do shit. So that's—that's what we gotta do." Appellant Lee told defendant Daniels that they "need to

---

[11]    According to Detective Thomas, DDC uses the term "cheesies" to refer to Hispanic gang members.

17

have a little powwow with ourselves, and then we go—and we go do exactly that, cuz, press everybody to go do somethin' cuz, from the top to the bottom, like, we gotta . . . press all the niggas that's young and active or these niggas with burners and all we—we gotta push 'em, cuz, we gotta push them . . . in the fields.[12]  You know?  I mean we done did it already."  Appellant Lee repeated, "We done did it," before stating that he would remember who would be "willin' and ready to slide, cuz."  The term "slide" refers going into someone else's territory for a confrontation.

To "stimulate" chatter among appellants and their codefendants, the police released certain information on the shootings to the press.  On March 20, 2017, the first release summarized the Vigil shooting and gave descriptions of four suspects involved.  During a phone conversation with an unidentified man the following day, defendant Daniels asked if the police had provided a description of any cars.

In the late morning of March 23, 2017, the police released a composite sketch of appellant Robinson as a potential suspect in the Vigil shooting.  During a phone call around 7:00 p.m. the same day, appellant Robinson asked appellant Barnes, "How that shit look just like me?"  Appellant Barnes replied, "But I say I think . . . you know, Mudder, is—it's got something to do with Mudder."  Appellant Robinson continued, "but for sure they don't got nothin' cuz because a nigga ain't did nothin'.  They gotta—they gotta prove that I did that shit man.  How the fuck that sketch look just like me?"  Appellant Barnes responded, "That's what I'm sayin'.  I take it, you already know the deal, I went through it.  You know the deal fool."

---

[12]    According to Detective Edgar Sanchez, another investigating officer in this case, a "burner" refers to a gun.

18

During a call three days later, appellant Robinson told appellant Barnes that the composite sketch had been posted to Facebook "to see if anybody that was there gonna say yeah I know that face." He then said "PDL (unintelligible) they not sayin' nothing." Appellant Barnes replied, "there ain't nobody talking about that game you hear me?" Appellant Robinson then stated that he had talked to another person ("Young Ace"), and "told him not to get on the phone," and that Young Ace knew "not to say nothing, you feel me?" Appellant Robinson stated that "people shouldn't say, nobody should [say] nothing to nobody." Appellant Barnes replied, "Like nigga don't even like figure it out, I'll be, like, man so I don't know. I just say nigga I don't know; you know?" Appellant Robinson agreed, but stated, "They got my name, they got all that shit. They just need the Pasadena to confirm that it's me." Appellant Barnes stated, "They don't know if you hopped out or walked up so it's, like, how do they know what your face look[s] like?"

On March 30, 2017, the police released a flier depicting a photograph of one of the vehicles appearing on video surveillance. Next to the photograph of the vehicle was a stock photograph of a Buick. That afternoon, defendant Daniels spoke with a man known only as "Bo" over the phone about the flier. Defendant Daniels told Bo that the flier depicted the "same kind of make and model of my car." When Bo inquired whether the car was in his name, defendant Daniels stated, "Yeah it is, it's in my name though." Defendant Daniels then asked Bo if he should "paint my car tomorrow." Bo stated he needed to "think real quick," at which point defendant Daniels stated, "all they got like is a picture of the back of it," and "I didn't have no license plates on it Bo." Later that evening, defendant Daniels spoke to Corey Fluker and John W. Robinson over the phone. During the call, defendant Daniels told

19

both men that the picture was "blurry." John W. Robinson interjected, stating: "Hey. Fool, listen. . . . You need to just go to Wawa (Phonetic) and just get rid of that." Defendant Daniels agreed, stating that he would sell or trade his "game" the following day.[13]

Also that day, Pasadena Police Officer Dustin Gomez (one of the lead investigators in this case) was working at his desk at the police station when he received a phone call from a man who would not provide his name. Officer Gomez, who had listened to many of the conversations recorded on the wiretap, recognized the voice as that of defendant Daniels. During the call, defendant Daniels reported that he had heard about the shooting and recognized the car. Defendant Daniels told Officer Gomez that the car was not a brown Buick as was listed in the press release, but a different car: a rusted Chevrolet LeSabre with Arizona license plates.

Police released another flier on April 10, 2017, this time describing a fifth suspect. Around 5:30 p.m. the same day, appellant Lee told defendant Daniels over the phone that they "need to sit down and talk and put they heads together." Defendant Daniels replied, "Yeah. TS. If it say I got . . . my game before the shit happened [¶] . . . [¶] I'm good right? On my—like on the registration paper?" Also that day, defendant Daniels told a man named Reginald Ellison over the phone that the police "put another sketch out, cu[z]. They put another description out and one of the descriptions is my size."

---

[13] John W. Robinson was charged in this case with one count of accessory after the fact (§ 32; count 7), and possession for sale of cocaine base (Health & Saf. Code, § 11351.5; count 8). He was not tried alongside appellants and their codefendants. The jury in this case was instructed not to speculate about or consider counts 7 or 8.

Defendant Daniels asked Reginald Ellison to "[c]hange the [color or] something. They . . . lookin' for a brown Buick, Reggie."

Appellant Barnes spoke to appellant Lee on April 11, 2017. When appellant Barnes began speaking about various unidentified text messages, appellant Lee cut him off. Appellant Lee stated, "I don't got nothing to talk about." He then stated, "I ain't gonna talk about none of it, cuz. Like, if niggas ain't—you know, if niggas ain't talkin' about gettin' at these snitches cuz, it's nothin'. I don't wanna talk about nothin' else." Then, appellant Lee stated, "it's fucked with the police talkin' about—it's too late for all of that. They already got what they got. They already doin' what the fuck they doin', so fuck worrying about them. The only thing. . . [¶] . . . to worry about now is . . . that—circle get-together." Appellant Barnes asked, "when can we link up and talk about that?" Appellant Lee replied, "whenever it's convenient, we around each other somewhere—we're around the same area or something you know."

On April 11, 2017, Officer Gomez received another call from a person he later identified as defendant Daniels. The caller, who identified himself as "William Shamburger," stated that he had witnessed the Vigil shooting. Defendant Daniels stated that the shooting "was an inside job" by another gang, the Squiggly Lanes. He identified two cars that were involved in the shooting: a brown Mercury and a black Suburban. He continued, "I don't think the second vehicle was the one that did the shooting sir, it wasn't the— the Buick sir, I mean the Mercury, or what do you guys say. . . . Yeah that's a Mercury sir, to me. I seen the front of it." He also said that one of the victims named "Antoine" (in reference to Antoine Sutphen) had recently killed a member of the Squiggly Lanes in Las Vegas. Defendant Daniels stated that the Squiggly Lanes had placed a hit on Antoine.

21

Appellants Barnes and Robinson spoke again on April 14, 2017. During the call, appellant Robinson asked if appellant Barnes had spoken with "fat nigga" (defendant Daniels's gang monikers were "Fat Daddy" and "Fat Boy") to "figure out where his head [is] at."

On April 26, 2017, Officer Gomez went to an apartment complex parking lot in the City of Los Angeles where he met with Reginald Ellison, the person whom defendant Daniels had asked to change his car's paint color. A Buick Century was located at the parking lot. Suspecting the car could be defendant Daniels's,[14] Officer Gomez impounded the car and executed a search warrant. Ellison provided Officer Gomez with the certificate of title to the car. The certificate matched the vehicle identification number, and listed a transfer of ownership from defendant Daniels to Ellison on January 5, 2017—one day before the Vigil shooting. After the Buick Century was impounded, two forensic specialists assisted Officer Gomez in processing and photographing car. At the request of Officer Gomez, one of the forensic specialists scratched off the topcoat of the car's exterior paint, revealing a tan or brown colored coat of paint underneath, which was consistent with the description of the vehicle used during the Vigil shooting. During a search of the car, Officer Gomez retrieved defendant Daniels's credit card from underneath the car's driver's seat.

In phone conversations on April 28, 2017, appellant Lee coordinated with defendant Vasquez and appellant Barnes about meeting at a fast-food

---

[14]    Pasadena Police Department Detective Jason Cordova testified that he personally observed defendant Daniels driving a brown Buick sedan on March 5, 2017. The license plate number that Detective Cordova had recorded matched the number on the car Officer Gomez saw in the apartment complex parking lot.

parking lot in Azusa. Several officers responded to the parking lot and conducted surveillance. The officers observed defendant Vasquez and appellants Lee, Barnes, and Robinson inside a blue sedan. The officers then watched as appellant Barnes and defendant Vasquez got out of the vehicle and drove away in separate cars. Appellants Lee and Robinson drove away in the same blue sedan.

Following appellant Lee's arrest on June 1, 2017, officers seized from his home four hats (one Washington Nationals hat, one blue hat with a lowercase "d," and two blue Detroit Tigers hats) and a gold chain with a lower case "d" emblem. Detective Thomas testified that DDC adopted logos from the Detroit Tigers and Washington Nationals. He also testified that DDC used the City of Duarte's logo—a lowercase "d" with an arrow on the end.

Appellant Barnes was also arrested at his home on June 1, 2017. Pursuant to a search warrant, officers seized and downloaded data from five cellular phones found inside appellant Barnes's home. Officer Gomez testified that one photo saved on the phones showed appellants Robinson, Barnes, and Lee standing next to each other. Another photo depicted appellant Barnes's haircut, which included references to "2100" (the 2100 block of Felberg Avenue is in Duarte) and a lower case "d." A series of five photographs in a collage depicted the burning of a red "doo-rag" while someone held a blue hat with a "d" emblem.

Defendant Daniels was arrested by United States Marshals in rural Mississippi in September 2017. Officer Gomez was present for the arrest.

On August 10, 2017, Los Angeles Sheriff's Deputy Jose Garcia was working his shift inside a Los Angeles County jail when he came into contact with appellant Lee. Deputy Garcia asked appellant Lee where he was going. Appellant Lee reached into his pocket and produced a pass. As he did so,

23

another piece of paper fell out of his pocket. Garcia recognized the piece of paper as a "kite," a term used to describe written messages that inmates pass to each other in the jail. The kite stated in part, "From your home put Brandon's death spot into your Goggle [*sic*] map and see the distance."

## B.   *Defense Evidence*

Defendant Vasquez and Appellants Lee and Barnes presented no affirmative evidence in their defense. Appellant Robinson's only witness was Officer Gomez, whom he recalled to the stand for reasons not relevant to the issues in this appeal.

## DISCUSSION

### A.   *Exclusion of Evidence of Derrell Davis's Potential Involvement in the Douglas and Vigil Shootings*

#### I.   *Relevant Background*

The issue of third-party culpability was handled piecemeal throughout the trial. We therefore summarize the import of the proceedings as a whole rather than discuss each procedural event as it unfolded during the trial.

To raise a reasonable doubt as to his own guilt, appellant Lee sought to introduce evidence at trial that Derrell Davis, a documented member of the Altadena Blocc Crips (another rival gang of PDL), was somehow involved in the Douglas shooting and Vigil shooting. Regarding the Douglas shooting, appellant Lee sought to introduce evidence that Pasadena Police Department sergeant Anthony Russo, another investigating officer in this case, once considered Davis a suspect in the Douglas shooting. As part of his investigation, sergeant Russo obtained cellular tower data from Davis's phone and determined that he had been in La Cañada (north of the Douglas

24

shooting) at 9:35 p.m. on December 22, 2016, which was around 12 minutes before the shooting. Davis's phone used a cellular tower closest to the shooting scene around 11:03 p.m. when two videos were posted to Davis's Snapchat account. In the first video, Davis drove his car through the street while officers were at the scene of the shooting. An unidentified voice in the background stated, "somebody got served; on Altadena cuz, fuck licks." The term "licks" refers disparagingly to PDL gang members. In the second video, Davis can be seen holding guns and throwing gang signs alongside other individuals in a park. In the early morning hours of December 23, 2016, Davis was involved in another shooting at an Altadena drive-thru restaurant. Sergeant Russo collected an expended cartridge case from near the scene of the shooting and sent it for comparison against the cartridges collected from the Douglas shooting. It was later determined that the cartridges had been fired from different guns.

With regard to the Vigil shooting, appellants and their codefendants sought to introduce statements that Leonard Howard (one of the witnesses to the Vigil shooting) had made to the police during an interview after the shooting.[15] In one part of the interview, Howard told the police he had received threatening text messages from Davis at unspecified dates. In one message, Davis sent Howard a photograph of himself holding a grenade and stating, "I could have got you, but I didn't want to. I'm going to get you the next time."[16] In another part of his interview, Howard told the police he had

---

[15] Howard's interview was not introduced into evidence at trial, and is not part of the record on appeal. The statements appellants sought to introduce were discussed at sidebar conferences during trial.

[16] As to the written caption appearing in the photograph, the court sustained an objection based on relevance and hearsay.

seen a white Dodge Charger on Fair Oaks Avenue the night of the shooting that may have been associated with Davis. Howard then told the police, "I don't know if it was really them" in reference to Davis.

The court held a first hearing to determine whether to admit the proffered evidence, and later revisited the issue throughout the trial. In substance, the prosecutor argued that while Davis's motive and opportunity to commit both shootings could be established by the proffered evidence, under *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), neither motive nor opportunity are bases on which to admit third party culpability evidence. Because the evidence did not establish Davis's role in the Douglas or Vigil shootings, the prosecutor requested that the court exclude the evidence as irrelevant under Evidence Code section 352. Defense counsel argued that the evidence established not only motive, but direct evidence that Davis was present "at both crime scenes." The court disagreed, finding the evidence did not directly or circumstantially link Davis to the perpetration of either shooting. The court excluded the evidence.

Nonetheless, at trial the court allowed defense counsel to impeach Leonard Howard through statements he had purportedly made to the police. Howard was asked whether he had told the police he had seen Derrell Davis drive a white Dodge Charger on Fair Oaks Avenue or Claremont Street the night of the Vigil shooting. Counsel also asked whether Howard had told the police that the vigil had moved after Howard saw Davis's car nearby. Howard testified that he could not recall making these statements to the police.

II.    *Analysis*

Appellants Lee, Robinson, and Barnes assert their convictions on counts 1 (conspiracy to commit murder), 2 and 3 (first degree murder of Sutphen and Duncan), and 4 and 9 (attempted murder of Janell Lipkin and Wright), must be reversed because the trial court erred in excluding evidence that Davis was involved in the Douglas and Vigil shootings.  Appellants also assert that the court erred by not expressly referring in its ruling to the factors set forth in Evidence Code section 352.  We reject both contentions.

To be admissible, evidence of a third person's culpability "need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability." (*Hall, supra,* 41 Cal.3d at p. 833.)  Evidence of "motive or opportunity to commit the crime in another person, without more, will not suffice . . . : there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*)

"'[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352).'" (*People v. Lewis* (2001) 26 Cal. 4th 334, 372 (*Lewis*).)  We review the trial court's exclusion of third party culpability evidence for abuse of discretion and must affirm if the court's ruling is correct on any ground.  (*People v. Turner* (2020) 10 Cal.5th 786, 817 (*Turner*); *People v. Ghobrial* (2018) 5 Cal.5th 250, 283.)

We find no abuse of discretion in the court's ruling in this case. Notably absent is any evidence creating a reasonable inference that Davis

27

was somehow involved in the murders committed in the Douglas or Vigil shootings. The proffered evidence merely suggested that Davis might have been in the area of the shootings, was an Altadena Blocc Crips member, and had a motive to target PDL members. Nothing suggested he was actually involved in any of the relevant events of the two shootings. (See *Lewis*, *supra*, 26 Cal.4th at p. 373 ["evidence is irrelevant if it produces only speculative inferences"]; *Turner*, *supra*, 10 Cal.5th at p. 817 ["[w]e have repeatedly upheld the exclusion of third party culpability evidence when the third party's link to a crime is tenuous or speculative"]; accord, *People v. Panah* (2005) 35 Cal.4th 395, 481, *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1135–1137.) Further, even had the evidence somehow connected Davis to the shootings, there was nothing to show how his supposed involvement had a tendency in reason on the entire record—including the exceptionally strong evidence linking appellant Lee to both shootings, and appellants Robinson and Barnes to the Vigil shooting—to exonerate appellants.

Finally, we find no error in the court's failure to expressly weigh the factors set forth in Evidence Code section 352. The evidence was not relevant in the first place, as it had no tendency in reason to demonstrate Davis's guilt or appellants' innocence. In any event, invocation of the Evidence Code section 352 factors is not required if the court "clearly had the concerns of that statute in mind when excluding the evidence. Moreover, express reliance on section 352 is not required because we must affirm if the court's ruling is correct on any ground." (*Turner*, *supra*, 10 Cal.5th at pp. 817–818.) Viewing the court's ruling in context (particularly the prosecutor's request that the court exclude the evidence under Evidence Code section 352), the court clearly had that statute in mind when making its ruling.

B.  *Kill Zone Instruction on Attempted Murder*

Appellants Lee, Robinson, and Barnes contend there was insufficient evidence to warrant a jury instruction on the "kill zone" theory of attempted murder under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*).  We agree the evidence was insufficient, but find the error harmless.

I.  *Governing Law*

Attempted murder requires the specific intent to kill the victim(s), and the commission of a direct but ineffectual act toward completing the killing. (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.)  As here relevant, there are two scenarios in which a defendant concurrently intends to kill multiple victims.  (See *People v. Stone* (2009) 46 Cal.4th 131, 141 (*Stone*); *People v. Bland* (2002) 28 Cal.4th 313, 329 (*Bland*).)

Under one scenario, a defendant intends primarily to kill a specific victim while concurrently intending to kill others within a zone of fatal harm or "kill zone." (*Canizales, supra*, 7 Cal.5th at p. 603; *Bland, supra*, 28 Cal.4th at p. 329.)  The Supreme Court in *Canizales* narrowed the circumstances in which courts may instruct on this kill zone theory.  The Court held that the kill zone theory applies only when "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of the force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death . . . and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales, supra*, 7 Cal.5th at p. 607.)

Another scenario of concurrent intent exists when a defendant indiscriminately fires into a group of people with the intent to kill "a random person rather than a specific one." (*Stone*, *supra*, 46 Cal.4th at p. 141; see also *id.* at p. 140 [a primary target is "not required" under such scenario].) Under this theory, the defendant need only intend to kill "anyone who got in the way of his bullets." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 396 (*Thompkins*).)

We independently review the record to determine whether substantial evidence supports a jury instruction. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 565.) If the record does not support the instruction, we must reverse the conviction on which the instruction is based unless the error was non-prejudicial. (*Canizales*, *supra*, 7 Cal.5th at pp. 613–614.)

Different standards of prejudice apply to different instructional errors. (*Canizales*, *supra*, 7 Cal.5th at p. 613, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1128–1129 (*Guiton*).) For factually unsupported but legally sound instructions, we may reverse only when the record "affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Guiton*, *supra*, at p. 1130.) For legally inadequate instructions, we may reverse only if there is a reasonable likelihood that the jury understood and applied the instruction in a legally impermissible manner. (*Canizales*, *supra*, at p. 614.)

II.  *Use of the Kill Zone Instruction in This Case*

To convict appellants and their codefendants of the attempted murders of Janell Lipkin and Shamark Wright in the Vigil shooting (counts 4 and 9), the jury was instructed that it must find beyond a reasonable doubt that appellants and their codefendants intended to kill a person, and took at least

one direct but ineffective act toward killing another person. (CALCRIM No. 600.) The instruction also provided as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Janell Lipkin and Shamark Wright, the People must prove that the defendant not only intended to kill Antione [*sic*] Sutphen and Ormoni Duncan but also intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Antione [*sic*] Sutphen and Ormoni Duncan by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Janell Lipkin and Shamark Wright."

The prosecutor also argued to the jury the following: "You don't have to find that [the defendants] intended to kill anyone specific but that they actually saw a person, and they intended to kill a person." The prosecutor continued: "You will see that there's some instruction about the kill zone theory. So another theory where you can find them guilty of the attempted murders . . . is if, for example, you thought they didn't see who they were shooting at, but they were intending to kill Antoine Sutphen and Ormoni Duncan, and while they were shooting at [them], they sprayed the entire area with shots to kill everyone in that zone. And if Janell Lipkin and Shamark Wright were in that zone, then the defendants would be guilty of attempted murder under a kill zone theory; that they, essentially, created a kill zone where they intended that everyone in that zone die."

III.  *Analysis*

We agree with appellants that the trial court erred by giving the kill zone instruction in this case. Nothing about the circumstances surrounding

31

the Vigil shooting suggests that Duncan or Sutphen were primary targets, or that the appellants and their codefendants intended to kill them by creating a fatal zone of harm.

The error, however, was harmless. To begin with, we find the instruction to be factually unsupported, but legally sound. (*Canizales*, *supra*, 7 Cal.5th at p. 613.) The jury received an instruction requiring an intent to kill two primary targets (Sutphen and Duncan), the creation of a "'kill zone,'" and an intent to kill everyone within that fatal zone of harm, including Janell Lipkin and Shamark Wright. (CALCRIM No. 600.) This instruction, which was made prior to *Canizales*, properly instructed the jury on both prongs of the test formulated in *Canizales*.

Appellants assert that the instruction, combined with the prosecutor's closing remarks, created a "significantly broader" definition of the kill zone theory. Appellants appear to argue that the prosecutor's closing argument reduced the requisite intent to kill everyone within the zone of harm to a mere conscious disregard of the risk of serious injury or death.

We are not persuaded. Nothing in instruction or closing argument suggested that the jury could convict the defendants if the shooters simply created a zone in which the victims *could* be killed. (Compare *Canizales*, *supra*, 7 Cal.5th at pp. 613–614 [improper argument to the jury that "'people are within the zone that they can get killed'" was "significantly broader than a proper understanding of the theory permits"].) Rather, the relevant jury instruction confirmed the necessity that the shooters created a zone in which they *intended* that every person in the zone *would* be killed. The prosecutor's closing remarks did nothing to broaden the mental state required; they actually reinforced the jury's understanding that the defendants were required to fire gunshots "to kill everyone in that zone."

There being no legally inadequate ground on which the jury could apply the kill zone instruction, we must determine whether the record affirmatively demonstrates a reasonable probability that the jury found appellants guilty under the kill zone theory. (*Guiton, supra*, 4 Cal.4th at p. 1130.)

The facts in this case do not present a scenario in which an intent to kill one victim was clearer than an intent to kill another. On the contrary, the evidence overwhelmingly established an indiscriminate drive-by shooting. (See *Stone, supra*, 46 Cal.4th at p. 141; *Thompkins, supra*, 50 Cal.App.5th at p. 396.) Defendants ambushed a closely congregated group of people (some separated by one or two feet) under the cover of night and fired over 20 shots from five different firearms in one direction toward the group. (Compare *People v. Cardenas* (2020) 53 Cal.App.5th 102, 116 [shooter fired directly at one victim from close range and continued firing toward that specific victim, leading to reasonable inference shooter did not intend to kill those who were not in the line of gunfire].) Nothing in the ballistics evidence suggests that Sutphen and Duncan were primary targets. On the contrary, the decedents sustained fewer gunshot wounds than the surviving victims (Janell Lipkin and Shamark Wright). Thus, because the evidence virtually compelled a finding that appellants and their codefendants fired repeatedly at a group of individuals with the intent to kill every person in the line of fire, a theory the prosecutor correctly argued to the jury, the record does not "affirmatively demonstrates a reasonable probability that the jury in fact found [defendants] guilty solely on the unsupported [kill-zone] theory." (*Guiton, supra*, 4 Cal.4th at p. 1130.) Accordingly, reversal is not warranted.

C.    *Sufficiency of the Evidence of Conspiracy to Commit Murder*

Emphasizing the absence of direct evidence of an agreement among themselves and their codefendants to commit murder in the Vigil shooting, appellants Lee, Robinson, and Barnes contend there was insufficient evidence to support the jury's finding that they conspired to commit murder. We disagree.

Conspiracy to commit murder requires the intent to agree or conspire, intent to commit murder, and an overt act that is committed in California by one or more of the conspirators. (*People v. Juarez* (2016) 62 Cal.4th 1164, 1169; *People v. Swain* (1996) 12 Cal.4th 593, 600.) Intent to agree or conspire need not be proven by an express agreement, but may be established by evidence supporting an ""an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.'" [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 145.)

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).)

Here, appellants do not dispute that the evidence was sufficient to prove that appellant Lee killed Brandon Douglas in the Douglas shooting and that members of DDC committed the Vigil shooting. They contend only that there was no direct evidence of an *agreement* to commit murder in the Vigil shooting in which appellants were personally involved. That may be true,

but ample circumstantial evidence, a category of evidence often used to establish criminal conspiracy (see *People v. Homick* (2012) 55 Cal.4th 816, 835 (*Homick*)), supported the jury's finding.

On December 22, 2016, appellant Lee shot and killed Brandon Douglas. On January 6, 2017, the Duarte shooting occurred in DDC territory, a potential act of retaliation by PDL for the Douglas killing. Hours after the Duarte shooting occurred in DDC territory, the Vigil shooting occurred in PDL territory. To make clear to all present that the Vigil shooting was an act of retaliation by DDS in the ongoing rivalry with PDL, one of the perpetrators yelled out the term "slobs," a term of disrespect referring to members of PDL.

None of the defendants in this case had a more personal interest in the Vigil shooting than appellant Lee: the shooting occurred at a ceremony to mourn the death of Douglas, the PDL associate defendant had killed nine days earlier. Moreover, the shooting was an act of retaliation against PDL in response to the Duarte shooting which, in turn, was PDL's retaliation for defendant's murder of Douglas.

Furthermore, appellant Lee's interest and participation in the planning and execution of the Vigil shooting can be reasonably inferred from his ongoing cellular communication with appellants Robinson and Barnes and their codefendants, and appellant Lee's movement before and after the Vigil shooting. Minutes after the Duarte shooting, defendant Daniels traveled from Duarte westbound along interstate 210 toward Pasadena. While moving about in Pasadena, he communicated with appellants Barnes and Robinson (each in the same area of Duarte), and appellant Lee, who at the time was in La Verne. Then, around 11:00 p.m., all of the defendants were in the same area of Duarte before they moved westward along interstate 210.

35

Although appellant Lee did not use his phone around the time of the shooting, his cohorts—appellants Robinson and Barnes, and defendant Daniels—did, placing them in areas of Pasadena covering the scene of the shooting prior to and immediately following the shots-heard call.[17]  (Cf. *People v. Navarro* (2021) 12 Cal.5th 285, 304 (*Navarro*) [conspiracy to commit murder reasonably inferred from the defendant's cellular phone contact with several co-conspirators before the killing and "continuing through the night"].)

This evidence as a whole amply supports a finding that appellants Lee, Robinson, and Barnes, and defendant Daniels executed an implicit or explicit mutual plan to commit murder in the Vigil shooting as retaliation for the Duarte shooting.

This case is readily distinguishable from *United States v. Garcia* (9th Cir. 1998) 151 F.3d 1243, on which appellant Lee relies.  (See *id.* at pp. 1244, 1247 [government presented no evidence to explain series of events preceding shooting to establish an implicit or explicit agreement].)  In any event, that a contrary finding can be reconciled with the facts in this case does not mean the evidence was insufficient to support the verdict.  (*Lindberg*, *supra*, 45 Cal.4th at p. 27; see *Navarro*, *supra*, 25 Cal.5th at p. 306 [reviewing courts must review "the sufficiency of the evidence to support a criminal conviction . . . [and] not to weigh the evidence to determine the most likely interpretation"].)

---

[17]    Cellular phones that used towers covering the shooting scene and surrounding areas in Pasadena included defendant Daniels's phone (11:34-11:53 p.m.), appellant Barnes's phone (11:43-11:51 p.m.), and appellant Robinson's phone (11:34 p.m.).

D.    *Errors in the Admission of Evidence*

Appellants Lee, Robinson, and Barnes raise several claims of evidentiary error.[18]  We review these claims under the abuse of discretion standard, and will not disturb the trial court's rulings unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner.  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095, 1108 (*McCurdy*).)  Similar to its treatment of third-party culpability evidence, the trial court addressed the evidentiary issues at various times during the trial.  As we shall discuss, we find no abuse of discretion in the trial court's rulings.

I.    *Evidence of Gang Membership and Participation*

Appellants contend the trial court erred by admitting various types of gang evidence, including graffiti observed by officers before and after the Douglas and Vigil shootings, appellants' gang tattoos and monikers, and photographs of defendant Daniels and appellant Barnes making gang signs. Appellants assert this evidence was irrelevant, cumulative, and highly prejudicial.  We disagree.

a.    *Governing Law*

Except as otherwise provided by statute, "all relevant evidence is admissible (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d)), and relevant evidence is defined as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  (Evid. Code, § 210.)  Evidence is relevant if it

---

[18]    Trial counsel for each defendant stipulated that any objection made by one defendant would be deemed to have been made by all defendants.  When discussing the relevant background, we refer to "defense counsel" for ease of reading.

37

tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Williams* (2008) 43 Cal.4th 584, 633–634.) Evidence that is relevant may still be excluded "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Evidence of a defendant's gang affiliation—including evidence of gang territory, membership, signs and symbols, beliefs and practices, criminal enterprises, rivalries, and the like—is often relevant and admissible to prove identity, motive, and intent. (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953; see *People v. McKinnon* (2011) 52 Cal.4th 610, 655; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; *People v. Williams* (1997) 16 Cal.4th 153, 193.) Gang evidence is also relevant to prove an underlying crime was committed for the benefit of, at the direction of, or in association with a criminal street gang for purposes of imposing a gang-related enhancement or special circumstance allegation. (§§ 186.22, subds. (b)(1), (f), 190.2, subd. (a)(22); see *People v. Rivera* (2019) 7 Cal.5th 306, 331-332.)

b.      *Relevant Background*

The prosecution sought to introduce video and photographic evidence of gang graffiti appearing at the Community Arms and Kings Villages apartment complexes in June 2016. The prosecution argued the evidence, including a video of defendant Daniels, appellant Barnes, and La'Shaun Morgan (a fellow member of DDC) tagging in PDL territory, was relevant to motive to commit the shootings in a rival stronghold. Defense counsel objected to the evidence, and argued that the timing of the graffiti (appearing

38

seven months before the Vigil shooting) rendered the evidence irrelevant and lacking in probative value. The court overruled the objections, finding the evidence to be relevant and probative on the existing animus between the gangs, and to appellant Barnes's and defendant Daniels's gang membership and familiarity with Kings Villages.

The prosecution introduced into evidence several photographs of the June 2016 graffiti. Pasadena Police Department Officer Trevon Sailor testified that he had taken the pictures appearing in the Community Arms apartment complex. In the pictures, he identified several terms referencing DDC and disparaging PDL, including: "Roc Crip Danga Lanes K," "LK [and] BK," and "2100 Goodall Three Times Moving, WS, Duroc, Fuc Baby Ed, Mr. Danga Lanes K."[19] According to the gang expert, Detective Thomas, the June 2016 graffiti coincided with attacks and violence between DDC and PDL.

During his testimony, Pasadena Police Department Detective Edgar Sanchez (another investigating officer in this case) was shown a video of three individuals spray painting a wall of the Community Arms apartment complex. Based on his own experience handling the investigation, Detective Sanchez identified the individuals as defendant Daniels, appellant Barnes, and La'Shaun Morgan. Detective Thomas testified that the video "re-affirmed" his belief that defendant Daniels and appellant Barnes were active members of DDC.

The prosecution also requested permission to introduce photographs that had been taken in February 2017 of graffiti appearing in a bathroom stall in an area claimed by DDC. The prosecution argued the evidence would

---

[19] According to Officer Sailor, Baby Ed is a well-known PDL member. Officer Sailor also testified that "LK" and "BK" refer to Lanes Killer and Bloods Killer.

be used to respond to defense counsel's questioning whether the Douglas and Vigil shootings enhanced DDC's reputation. Over defense counsel's relevance and Evidence Code section 352 objections, the court granted the request.

During redirect examination, Detective Thomas testified that he had seen photographs of graffiti in DDC territory around February 2017, which coincided with lesser attacks on the gang following the Douglas and Vigil shootings. In photographs shown the jury, Detective Thomas identified portions of the graffiti in which DDC had taken credit for the shootings, including: "We up one," "187 All," and "Fucc Slobs."

Finally, the prosecution sought to introduce evidence of the defendants' gang monikers and tattoos. Over defense counsel's relevance and Evidence Code section 352 objections, the court admitted the evidence, finding it relevant and probative on gang membership, and the degree to which each defendant participated in DDC.

Detective Thomas testified that he had personally contacted the defendants in the past and knew them by their respective gang monikers. From various photographs shown to the jury, Detective Thomas identified gang tattoos on each defendant. Based on these tattoos, Detective Thomas opined that each was a member of DDC. Detective Thomas was also shown multiple photographs of the defendants. In several photographs, appellants Lee and Robinson were depicted wearing clothing and jewelry associated with DDC, including a Detroit Tigers hat, a necklace with a lowercase "d" design, and blue shoes.

c.    *Analysis*

The trial court in this case carefully considered the probative value of the various types of gang evidence against its potential for prejudice, and

ruled that the evidence was admissible.  The court did not abuse its discretion by so ruling.  (*McCurdy*, *supra*, 59 Cal.4th at pp. 1095, 1108.)

The June 2016 gang graffiti was relevant to establish motive by showing the existence of an ongoing war between DDC and PDL.  The February 2017 graffiti was relevant to prove the identity of appellants and their codefendants as perpetrators and coconspirators.  The jury could readily infer from the video depicting defendant Daniels and appellant Barnes tagging a Community Arms complex wall that each was familiar with the area in which the Vigil shooting took place.  Further, the February 2017 graffiti claimed responsibility for the Vigil shooting, and used the very same derogatory term ("slobs") that one of the shooters shouted during the Vigil shooting.  The timing in which law enforcement observed these pieces of graffiti (six months before, and one month after the Vigil shooting) did not deprive the evidence of its probative value.  (See *People v. Gionis* (1995) 9 Cal.4th 1196, 1213–1214 (*Gionis*) [statements are not necessarily "remote as to be lacking in probative value" if they are made "almost a year and a half" after the crimes].)  "[W]hether the statements reflected merely a transitory state of mind, as opposed to something more [enduring], was a question for the jury to decide."  (*Id*. at p. 1214.)


II.　*Appellant Lee's Google Searches and Text Message*

Appellants contend the court erred by admitting Google searches appellant Lee had made on January 30, 2017 (several weeks after the Vigil shooting) for how to maintain and break down Glock firearms.  They also contend that the court erred by admitting an April 3, 2017 text message appellant Lee sent to appellant Robinson, which depicted four firearms with the following message: "40/450, 9/350, 380/100, 38/250."  Appellants assert

the evidence of his Google searches, and the content of appellant Lee's text message, amounted to irrelevant and prejudicial propensity evidence. They also contend that the origin of the text message was not properly authenticated. We disagree.

### a. *Relevant Background*

The prosecution requested permission to introduce evidence obtained from appellant Lee's Google subscriber information, including internet searches he had made regarding Glock firearms. Over a defense objection that the evidence of the searches was irrelevant and inadmissible under Evidence Code section 352, the court admitted the evidence.

Detective Russo testified that he had authored a search warrant for appellant Lee's Google subscriber information, which included his contacts and internet searches. After reviewing the information provided by Google, Detective Russo testified that appellant Lee had entered the following internet searches on January 30, 2017: "Glock 19 cleaning and lubrication"; "how to clean a Glock at home"; "how to sand a gun barrel down"; the "best sandpaper for a Glock slide"; "looking for gun shops in Duarte"; and "price of a Glock 19 gen 3 firing pin." A Glock 19 is a .9 millimeter handgun. Based on her analysis in this case, senior criminalist Whitehead testified that a Glock handgun "could be a candidate" responsible for firing .9 millimeter cartridge cases collected at the Vigil shooting scene. She also testified that "sanding down a barrel" could refer to refinishing the barrel or changing its rifling to affect a projectile analysis.

The prosecution also sought to introduce a text message sent from appellant Lee's cell phone to appellant Robinson. The court overruled defendant Lee's objections based on foundation, relevance, and Evidence

Code section 352 objection, but informed the prosecution that it would have to lay a foundation for the text message.

Detective Sanchez testified that the wiretap of appellant Lee's phone intercepted an April 3, 2017 text message. The message appeared on a line sheet used to annotate calls or messages. The line sheet identified an outgoing phone number (appellant Lee's), incoming phone number (appellant Robinson's), date (April 3, 2017), and time (7:49 p.m.). The line sheet listed verbatim the language appearing in the text message and included a photograph that had been attached to the message. The text message showed a photograph of four firearms with the following message (inferably referring to caliber and sales price for each of the four depicted gun): "40/450, 9/350, 380/100, 38/250."

b. *Analysis*

Both categories of evidence at issue here—the April 2017 text message of firearms sent by appellant Lee to appellant Robinson, and the January 2017 Google searches—were relevant and probative on appellant Lee's connection to the crimes in this case, namely the use of a firearm to commit murder and attempted murder. The evidence did not show appellant Lee's propensity to shoot people, but rather that he had access to and familiarity with the same caliber of firearms that had been used during the shootings— either a .40 caliber Smith & Wesson or .38 special during the Douglas shooting, and a .9 millimeter during the Vigil shooting. (See *Homick, supra,* 55 Cal.4th at p. 876 [defendant's possession of same type of weapon used in the shooting probative of whether he was connected]; *People v. Riser* (1956) 47 Cal.2d 566, 577 [possession of weapons that could have been employed during a homicide is permissible when the specific type of weapon used is not

43

known], overruled on another ground in *People v. Morse* (1964) 60 Cal.2d 631; cf. *People v. Henderson* (1976) 58 Cal.App.3d 349, 360–361 [error to permit inquiry into possession of weapon wholly unconnected to the charged crime]; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1381–1384 [same].) Thus, the evidence was not inflammatory, confusing, or prejudicial under Evidence Code section 352.

The April 3, 2017 text message was also properly authenticated. A writing must be authenticated before it may be admitted into evidence. (Evid. Code, § 1401, subd. (a); *People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) To authenticate a writing, the proponent must introduce evidence sufficient to sustain a finding that it is the writing he or she claims it is, or establish such facts "by any other means provided by law." (Evid. Code, § 1400.) The proponent may rely on circumstantial evidence or the writing's own content to authenticate a writing. (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187 (*Skiles*); see *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435 (*Valdez*) [there is "no restriction on 'the means by which a writing must be authenticated'"].) The fact conflicting inferences can be drawn as to the writing's authenticity "'goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*Goldsmith, supra*, at p. 267.)

Detective Sanchez's testimony confirmed that appellant Lee's phone had sent the text message with particular content, at a particular time, and to a particular person (appellant Robinson). Contrary to appellant Lee's suggestion, for authentication purposes (or for any other purpose as well) no expert testimony was required to *definitively* confirm that the calibers listed in the message matched the firearms depicted in the photograph. (See *Goldsmith, supra*, 59 Cal.4th at p. 267 ["'[a]s long as the evidence would support a finding of

44

authenticity, the writing is admissible'"].)  The court did not abuse its discretion by admitting appellant Lee's Google searches and text message.

###### III.    *Statements by the Codefendants*

Appellants contend that the court erred by admitting recorded statements of the other codefendants under the coconspirator exception to the hearsay rule.  They assert that the statements do not fall under such exception because they were made after the object of the conspiracy— murder—had occurred.

Appellants have not identified in any appellate brief what particular statements they claim should have been excluded at trial, or how the introduction of any statement was prejudicial.[20]  They have thus forfeited his contention on appeal.  (See *People v. Wong* (2010) 186 Cal.App.4th 1433, 1446–1447, fn. 9 (*Wong*); *Guthrey, supra*, 63 Cal.App.4th at p. 1115.)  In the alternative, as we discuss, the evidence was properly admitted.

---

[20]    Appellants Robinson and Barnes have provided no argument or discussion on any evidentiary issue, but instead have filed notices of joinder to the argument made in appellant's Lee's opening brief.  Appellant Lee's opening brief, 152 pages in total, appears to suggest that this court identify the pieces of evidence he classifies as "telephone conversations," "graffiti," and "text messages."  A considerable number of recorded conversations, graffiti, and text messages appear in the record on appeal, consisting of over 8,000 pages of reporter's transcript and 1,800 pages of clerk's transcript.  "It is not the duty of a reviewing court to search the record for evidence on a point raised by a party whose brief makes no reference to the specific pages where the evidence can be found."  (*Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1486; accord *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 (*Guthrey*).)

## a. *Governing Law*

Hearsay evidence (out-of-court statements offered for the truth of the matter asserted) is inadmissible unless subject to an exception. (Evid. Code, § 1200, subd. (b); *McCurdy, supra,* 59 Cal.4th at p. 1108.) Section 1223 of the Evidence Code provides an exception if the statements were "made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy," and were made "prior to or during the time that the party was participating in that conspiracy." The conspiracy need not be charged or even prosecutable for the exception to apply. (*People v. Brown* (2017) 14 Cal.App.5th 320, 332–333.)

A conspiratorial agreement need not encompass a particular point in time; "'it may be flexible, occurring over a period of time and changing in response to changed circumstances.' . . . Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a "single overall agreement."'" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553–554 (*Vargas*); see *People v. Zamora* (1976) 18 Cal.3d 538, 560, fn. 21 [an auto theft ring or series of robberies may constitute a "'continuing conspiracy'"].)

Only a prima facie showing of a conspiracy need be made before a coconspirator's statement may be admitted into evidence. (*People v. Armstrong* (2019) 6 Cal.5th 735, 794.) "'It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended.'" (*People v. Hardy* (1992) 2 Cal.4th 86, 143; see also *People v. Saling* (1972) 7 Cal.3d 844, 852, fn. 8 ["statements which merely narrate past events are not to be deemed as made in furtherance of a conspiracy [citations, but] such a rule cannot be applied mechanically"].)

b. *Relevant Background*

The prosecution filed a motion to admit over 20 separate statements that investigating officers had obtained from the wiretap of the phones of appellants and their codefendants between March 2017 and April 2018. At a hearing on the motion, the trial court's tentative ruling was to admit the evidence, but it granted defense counsel's request to file memoranda setting forth various objections to the statements.[21]

Later at trial, outside the presence of the jury, the court considered the defense objections. Defense counsel objected on hearsay grounds, and argued that the conspiracy had ended before the statements were made on the wiretap. Finding a sufficient basis to conclude there was an ongoing conspiracy to support the statements' admissibility under the coconspirator exception to the hearsay rule, the court stated: "the conspiracy exists up until the time, I believe, that the defendants are caught or the—if there [are] still actions in furtherance of that conspiracy, it can go beyond simply when the object of the conspiracy was committed if there is still further acts in relation to that conspiracy."

As part of its instructions to the jury, the court informed the jury that it could not consider "any statement made out of court by any of the speaker-defendant unless the [prosecution established] by a preponderance of the evidence that: [¶] 1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made; [¶] 2. The speaker-defendant was a member of and participating in the conspiracy when he made the statement; [¶] 3. The speaker-

---

[21] The court stated that defense counsel should be prepared to address coconspirator statements and statements against penal interest. No memorandum on either hearsay objection appears in the record on appeal.

defendant made the statement in order to further the goal of the conspiracy; [¶] AND [¶] 4. The statement was made before or during the time that the defendant was participating in the conspiracy." (CALCRIM No. 418.)

### c.    *Analysis*

Sufficient evidence supported a finding that the defendants' recorded statements were made during an uncharged conspiracy to commit acts of violence against rival PDL gang members. Separate acts in furtherance of that overall conspiracy included the commission of shootings of persons perceived as PDL affiliated, as well as the concealment and disposal of evidence. (See *Vargas, supra*, 91 Cal.App.4th at pp. 553–554.) The 20 recorded statements identified by the prosecution in its motion relate to these objectives.[22] (Compare *People v. Dominguez* (1981) 121 Cal.App.3d 481, 494– 496 [existence of conspiracy among codefendants to kill victims to promote their own interests within their gang]; *People v. Sully* (1991) 53 Cal.3d 1195, 1211–1212, 1230–1231 [statements to commit a potential witness to silence after murders were completed]; see also *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 432–433, disapproved on another ground in *People v. Valencia* (2021) 11 Cal.5th 818.)

Assuming arguendo that the coconspirator hearsay exception did not apply to the statements, there is no reasonable probability that a result more favorable to appellants would have been reached in the absence the evidence.

---

[22]    In several of the identified statements, defendant Daniels talked about concealing and transferring ownership of his car, and retaliating against people he and appellant Lee perceived as snitches. Other statements identified in the motion include those made by appellants Barnes and Robinson regarding the police's inability to identify a car, and regarding the identity of persons who might have been speaking with the police.

(See *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1308 [*Watson* error applies to the erroneous admission of hearsay evidence].)  First, the statements made by each codefendant (appellants Barnes and Robinson, and defendant Daniels) were otherwise admissible as statements by a party opponent (Evid. Code, § 1220), and were and highly probative on the non-hearsay basis of showing each codefendant's consciousness of guilt.  (See *People v. Noguera* (1992) 4 Cal.4th 599, 624–625 [statements offered to prove consciousness of guilt are not subject to the strictures of coconspirator statements under Evid. Code, § 1223]; *People v. Curl* (2009) 46 Cal.4th 339, 362 [same].)

Second, and independently, the court's instructions insulated appellants from any risk of undue prejudice.  (*People v. Ware* (2020) 52 Cal.App.5th 919, 944; *People v. Dehnel* (1979) 99 Cal.App.3d 404, 408–409.)  Assuming the jury agreed with appellants' theory that the conspiracy terminated upon completion of the Vigil shooting, CALCRIM No. 418 precluded any consideration of statements made after January 6, 2017.  We presume the jury followed this instruction.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  Thus, the court's admission of the evidence under Evidence Code section 1223 was neither erroneous nor prejudicial.[23]

IV.    *Social Media Evidence*

Appellants contend the trial court abused its discretion by admitting messages appearing on the Facebook and Instagram accounts of defendant Daniels and appellants Robinson and Barnes.  They assert that the

---

[23]    In light of our conclusion, we do not consider the alternative contention regarding the admissibility of the codefendants' statements as those against penal interest (Evid. Code, § 1230).

certificates of authenticity introduced at trial were insufficient to authenticate the messages appearing on social media, as "[a]nyone with the right password" could gain access to the accounts to author the messages.

Appellants have again failed to identify the particular messages they assert should not have been introduced against them at trial.[24]  This forfeits the issue on appeal.  Further, defense counsel did not interpose an objection during trial on the grounds that defendant Daniels or appellants Barnes and Robinson were not the authors of the social media messages.  For this reason, too, the contention is forfeited.  (See *Wong, supra*, 186 Cal.App.4th at pp. 1446–1447, fn. 9; *Guthrey, supra*, 63 Cal.App.4th at p. 1115; *People v. Abel* (2012) 53 Cal.4th 891, 924; see also Evid. Code, § 353, subd. (a).)  Alternatively, we find the contention meritless.


a.    *Governing Law*

The means of authenticating a writing are not limited to those appearing in the Evidence Code.  (*Skiles, supra,* 51 Cal.4th at p. 1187.)  As relevant here, section 1524.2 provides one means of authenticating electronic communications seized pursuant to a search warrant.  The procedures set forth in that statute permit use of an affidavit to authenticate such records in lieu of live testimony normally required under the business record exception (see Evid. Code, § 1271).  (§ 1524.2; Evid. Code, §§ 1561, 1562.)[25]

---

[24]    Outside of referencing "social media messages of Daniels, Robinson and Barnes" and "Facebook messages" in his briefs, appellant Lee has provided no record citation with respect to any evidence introduced at trial.

[25]    Section 1524.2 sets forth the procedures by which law enforcement may obtain records that are in the actual or constructive possession of a foreign corporation that provides electronic communication services or remote computing services to the general public.  (§ 1524.2, subd. (b).)  In response to

50

b.    *Relevant Background*

Seeking to admit evidence of photographs and messages appearing on Facebook and Instagram accounts held by defendant Daniels and appellants Robinson and Barnes, the prosecution argued the evidence was relevant to each codefendant's gang membership.  Defense counsel objected to the evidence, and argued it was lacking in foundation and did not meet the requirements of the business record exception.  Defense counsel also argued that a Facebook employee would have to testify to the records' authenticity.  In response, the prosecution argued that certificates of authenticity, which had been obtained by an investigating officer, would provide an adequate foundation for the evidence, and the photographs and messages could be authenticated circumstantially.  Subject to the prosecutor's ability to authenticate each piece of evidence, the court admitted the photographs and messages.

Detective Sanchez testified that he had authored search warrants for five different Facebook and Instagram accounts for defendant Daniels and appellants Robinson and Barnes.  For each account, Detective Sanchez obtained a certificate of authenticity from the law enforcement relations group for Facebook and Instagram.  The certificate of authenticity for the

---

a valid warrant, the corporation must provide an affidavit verifying the authenticity of the records it provides, and "[t]hose records shall be admissible in evidence as set forth in Section 1562 of the Evidence Code." (§ 1524.2, subd. (b)(4).)  Section 1562 of the Evidence Code provides: "If the original records would be admissible in evidence if the custodian or other qualified witness had been present and testified to the matters stated in the affidavit, and if the requirements of Section 1271 have been met, the copy of the records is admissible in evidence."

51

Facebook account associated with defendant Daniels, signed by the records custodian and dated November 2, 2017, stated:

"1.  I am employed by Facebook, Inc. ('Facebook'), headquartered in Menlo Park, California.  I am a duly authorized custodian of records for Facebook and am qualified to certify Facebook's domestic records of regularly conducted activity.

"2.  I have reviewed the records produced by Facebook in this matter in response to the Search Warrant received November 18, 2016.  The records include search results for basic subscriber information, IP logs, messages, photos, videos, other content and records for [Daniels].

"3.  The records provided are an exact copy of [those] that were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook.  The records were saved in electronic format after searching Facebook's automated systems in accordance with the above-specified legal process.  The records were made at or near the time the information was transmitted by the Facebook user.

"4.  I declare under penalty of perjury that the foregoing certification is true and correct to the best of my knowledge."  Nearly identical certificates of authenticity were issued by the Facebook and Instagram custodians of records in response to search warrants for the other accounts.

Before discussing the records obtained from Facebook and Instagram, Detective Sanchez testified that each account had been password protected and registered with an email address(es), name, and phone number(s). Detective Sanchez then identified various photographs and video footage obtained from the accounts associated with defendant Daniels and appellants Robinson and Barnes.  Detective Sanchez also discussed several messages in which each codefendant provided other users phone numbers that had been

associated with them at trial.[26]  In one direct message on January 14, 2017, appellant Robinson told a recipient, "we are goin at it wit[h] the lanes t[h]ough.  They lost three and they just took out an innocent nigga."  He continued, "it's good.  They down right now.  We made history."

### c.     *Analysis*

The certificates of authenticity for the social media accounts in this case met the requirements of section 1524.2 and Evidence Code sections 1561 and 1562.  The certificates were issued by the custodians of record who certified Facebook and Instagram's "domestic records of regularly conducted activity."  The custodians also identified the records as true copies of those sought in the search warrants, and attested that the records were kept in the regular course of business at or near the time the information was transmitted by each account user.  The records and contents therein being properly authenticated, the prosecution was not required to further authenticate them through live testimony.  (§ 1524.2; Evid. Code, § 1562.)

To the extent appellants contend there was insufficient evidence to support a finding that defendant Daniels and appellants Barnes and Robinson authored the messages appearing in social media records, we disagree.  Detective Sanchez testified that each social media account was

---

[26]     In one message, defendant Daniels told another user, "Call me," before listing a specified phone number.  In another message, appellant Barnes listed a phone number after stating, "Hey you alright?  I just got back out here. . . .  Hit me if you need anything."  In another message, appellant Robinson stated, "My messenger don't [*sic*] work unless I'm under wifi."  He then listed a phone number described as "my number."

The phone numbers provided in these messages match the numbers that had been associated with each codefendant at trial.

password-protected, and associated with each codefendant's name, email address, and phone number. Many of the messages appearing in the records informed other users that the author could be reached at phone numbers independently corroborated as being associated with defendant Daniels or appellants Robinson and Barnes.

All of this evidence tended to show that the codefendants created and maintained their own social media accounts. (See *Valdez, supra*, 201 Cal.App.4th at p. 1435 [personal photographs, communications, and other indicia of ownership and control were sufficient to authenticate MySpace page]; *People v. Cruz* (2020) 46 Cal.App.5th 715, 731 [Facebook messages authenticated in part by referencing things which the defendant knew or to which he had access].) The possibility that other people could access the accounts does not render the messages originating from them inadmissible. (See *Valdez, supra*, 201 Cal.App.4th at p. 1437 ["the proponent's threshold authentication burden for admissibility is *not* to establish validity or negate falsity in a categorical fashion"].) Any doubts concerning the accounts' ultimate authenticity went to the weight of the evidence, not its admissibility. (*Goldsmith, supra*, 59 Cal.4th at p. 267.)

E.    *Denial of Motion for Continuance*

Appellant Lee contends that the trial court abused its discretion by denying his oral motion to continue trial, made on the first day of his case-in-chief, to secure the testimony of a confidential informant. We disagree.

I.    *Relevant Proceedings*

Following the Douglas shooting in December 2016, an informant told the police that three members of the Altadena Blocc Crips gang were involved

in the shooting.[27] Portions of the warrant affidavits, including the identity of the informant, were sealed. (See *People v. Hobbs* (1994) 7 Cal.4th 948, 971.) On February 15, 2018, the prosecution provided trial counsel for appellant Lee the unsealed portions of the warrant affidavits, including the informant's name, and the names of persons the informant mentioned were involved in the Douglas shooting. Trial counsel and an investigator were authorized to contact the informant under a protective order prohibiting disclosure of the informant's identity to appellant Lee.

On December 12, 2018—one day after the prosecution rested its case-in-chief at trial—trial counsel for appellant Lee informed the court that the informant was in a Riverside County jail on a pending criminal case, and could not be secured for trial. Despite obtaining several transportation orders, trial counsel could not get the informant to court. The court noted that in light of the trial calendar, trial counsel would have six additional days to get the informant to court before trial resumed the following week. In the event counsel were to request a trial continuance to secure the informant's presence at trial, the court indicated it would likely deny the request.

Trial resumed on December 18, 2018. Outside the presence of the jury, trial counsel for appellant Lee informed the court he had filed a motion for a continuance (§ 1050) to secure the informant's presence at trial, or in the alternative, to take a videotaped interview.[28] Counsel informed the court that the informant's pending sentencing hearing prevented the informant

---

[27] The police subsequently learned that the leads were either false or could not be independently verified.

[28] The record on appeal does not include a written motion to continue trial filed by appellant Lee's trial counsel.

from speaking to defense counsel about his participation in this case. Noting the length of time defense counsel had to secure the informant's presence, the prosecution requested that the court deny the motion. The prosecution also informed the court that the informant's statements were inherently unreliable, as the informant had initially stated a man named Harris had committed "a hot one on December 22," but later clarified that he was talking about another shooting. According to the prosecution, the informant also stated he had heard about the shooting either from Harris or an unnamed woman.

The court denied the motion to continue, and found trial counsel had been aware of the informant's identity long before the commencement of trial in December 2018, and had waited until November 2018 to request transportation orders. The court also questioned the informant's willingness to testify,[29] and whether the informant would testify that a particular person had taken credit for the Douglas shooting. The informant's statements did not clearly reference the Douglas shooting, and appeared to have been obtained through hearsay.

II. *Analysis*

To continue any hearing or criminal trial, section 1050 requires written notice of a motion for a continuance to be filed and served at least two court days before the hearing or trial. (§ 1050, subd. (b).) If the moving party does

---

[29] The court noted that it was "very common for defendants who are facing prison time and are in custody to refuse to testify, rather than inculpate a fellow gang member . . . . And the only judicial recourse at that point would be to hold that individual in contempt, which is a meaningless threat for someone who is already in custody serving time."

not comply with this requirement, the court must deny the motion unless it finds good cause for the failure to comply. (§ 1050, subd. (d); *People v. Smithey* (1999) 20 Cal.4th 936, 1011.)

When addressing the merits, the court may not grant a motion for continuance absent a showing of good cause that the proffered testimony would be material, and the moving party exercised due diligence to secure the witness's attendance. (§ 1050, subd. (e); see *People v. Caro* (2019) 7 Cal.5th 463, 499–500; *People v. Wilson* (2005) 36 Cal.4th 309, 352 (*Wilson*).) A trial court has discretion in ruling on midtrial motions to continue the case, and appellate challenges to a trial court's denial of such a motion are "'rarely successful.'" (*Wilson, supra*, 36 Cal.4th at p. 352.)

Here, the court did not abuse its discretion in denying appellant Lee's oral motion to continue trial. At the outset, we note that appellant Lee has made no attempt to show compliance with the notice requirements of section 1050. In his appellate briefs, appellant Lee cites to a portion of the reporter's transcript wherein his trial counsel stated he had "just filed a 1050, and I'm requesting more time." But he has identified no written or filed motion in the appellate record, and we are aware of none. Nor has appellant Lee cited any portion of the record establishing good cause for the failure to comply with the notice requirements. These reasons alone support the denial of his oral motion to continue trial. (§ 1050, subds. (c), (d).)

Even considering the oral motion on the merits, appellant Lee has failed to demonstrate how he exercised due diligence to secure the informant's attendance at trial. His trial counsel waited until November 2018, nine months after counsel and his investigative team were informed of the informant's name and statements to the police, to attempt to contact the informant and secure his attendance at trial. Trial counsel then waited

57

another month to request a conditional interview. Under the circumstances, we cannot say the court abused its discretion in finding defendant's motion untimely. (See *People v. Riggs* (2008) 44 Cal.4th 248, 296; *People v. Jeffers* (1987) 188 Cal.App.3d 840, 850 [lateness of request to continue trial "may be a significant factor justifying denial absent compelling circumstances to the contrary"].)

Appellant Lee has likewise failed to demonstrate the materiality of the witness's proposed testimony. There was no showing of what admissible information the informant could impart to the jury that was relevant to help raise a reasonable doubt as to appellant Lee's guilt. Thus, because appellant Lee has not established a likelihood that a continuance would have resulted in the production of a witness or material evidence in support of his defense, he has demonstrated neither an abuse of discretion in the denial of a continuance, nor the existence of prejudice. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 509.)


F. *Cumulative Error*

Appellants Lee, Robinson, and Barnes contend the cumulative effect of the errors raised as to non-sentencing issues mandate reversal of their convictions. They are mistaken. As discussed, we have found only one error—the giving of the kill zone jury instruction—which we have concluded was not prejudicial. As for each of the other arguments on appeal, we have found them both meritless and alternatively non-prejudicial. In short, there is no basis for reversing based on cumulative error or cumulative prejudice. (*People v. Valdez* (2004) 32 Cal.4th 73, 139 ["none of the errors, individually or cumulatively, '"significantly influence[d] the fairness of defendant's trial or

detrimentally affect[ed] the jury's determination of the appropriate penalty"'"]; *People v. Hill* (1998) 17 Cal.4th 800, 844–845 [same].)

G. *Sentencing Issues*

Appellants Lee, Robinson, and Barnes raise several contentions with respect to their sentences. Appellant Lee was sentenced separately from appellants Robinson and Barnes. We summarize the relevant sentencing proceedings as to each appellant before addressing their contentions.

I. *Relevant Proceedings*

a. *Appellant Lee*

At his sentencing hearing on July 8, 2019, appellant Lee affirmed he was "submit[ting]" on the court's ability to use a certified packet from the California Department of Corrections and Rehabilitation (CDCR) regarding his prior convictions. Having reviewed the certified CDCR packet, the court found beyond a reasonable doubt that appellant Lee suffered various convictions in 2007, one of which was for assault with a firearm (§ 245, subd. (a)(2)), which the court found constituted a serious and violent felony (§§ 667, subds. (a)(1), (b)-(j), 1170.12, subds. (a)-(d)), as alleged in the information.

Prior to imposing sentence, the court declared it would be imposing consecutive sentences, as each count involved separate acts of violence against separate victims. (See Cal. Rules of Court, rule 4.425(a)(2).)[30] The court also indicated that the CDCR packet, probation report, and sentencing brief demonstrated that appellant Lee had suffered prior convictions

---

[30] Subsequent unspecified references to rules are to the California Rules of Court.

increasing in frequency, violence, and seriousness; appellant Lee was on a grant of supervision at the time of the offenses; his prior performance on probation was unsatisfactory; and the crimes involved great violence, cruelty, viciousness, and callousness.

Proceeding to sentencing, on both counts 2 and 3 (first degree murder of Antoine Sutphen and Ormoni Duncan), the court sentenced appellant Lee to three terms of life without the possibility of parole based on the jury's special circumstance findings (§ 190.2, subds. (a)(3) [multiple murder], (a)(21) [drive-by murder], (a)(22) [gang murder]), plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subds. (d)/(e)(1)).[31]  On counts 4 and 9 (attempted premeditated murders of Janell Lipkin and Shamark Wright), the court sentenced appellant Lee to a consecutive term of life imprisonment, plus a consecutive term of 25 years to life for the firearm enhancement, and five years for a prior serious felony conviction enhancement (§ 667, subd. (a)(1)).  On count 5 (shooting at an inhabited dwelling), the court sentenced appellant Lee to a consecutive upper term of seven years, which was doubled under the Three Strikes law, plus a consecutive term of five years for the prior serious felony conviction enhancement (the court stayed a term of 25 years to life for the firearm enhancement).  On count 6 (first degree murder of Brandon Douglas), appellant Lee was sentenced to two terms of life imprisonment without the possibility of parole based on the jury's special circumstance findings (§ 190.2, subds. (a)(3), (a)(22)), plus a consecutive term of 25 years to life for the firearm enhancement.  On count 1 (conspiracy to commit murder), the court

---

[31]    On counts 2, 3, 4, 6, and 9, the court imposed and stayed terms of 20 and 10 years imprisonment for the lesser firearm enhancements (§ 12022.53, subds. (b)-(c)/(e)(1)) that the jury found to be true.

imposed and stayed a term of 25 years to life for the underlying offense, plus 10 years, 20 years, and 25 years to life for the firearm enhancements (§ 12022.53, subds. (b)-(d)/(e)(1)).

b.  *Appellants Robinson and Barnes*

Appellants Robinson and Barnes were jointly sentenced during a March 5, 2020 sentencing hearing.  At the hearing, the court granted appellants' motions to strike their prior strike convictions under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.[32]  In striking the prior strikes, the court noted that it would be sentencing both appellants "to multiple life without possibility [of] parole sentences irregardless [*sic*] of the strike priors.  They will be spending the rest of their lives in prison."

Selecting count 2 (first degree murder of Antoine Sutphen) as the base terms for both appellants, the court imposed three terms of life without the possibility of parole based on the jury's special circumstance findings (§ 190.2, subds. (a)(3), (a)(21), (a)(22)), plus 25 years to life for the firearm enhancement (§ 12022.53, subds. (d)/(e)(1)).[33]  The court imposed the same

---

[32]  Appellant Barnes admitted he had suffered a juvenile adjudication for robbery in 2014 that qualified as a prior strike.  Appellant Robinson admitted he had suffered a 2009 conviction for burglary, which constituted a prior strike and prior serious felony conviction (§ 667, subd. (a)(1)).

[33]  It appears the court erred by imposing an indeterminate stayed sentence of 20 years to life on counts 2 and 3 under section 12022.53, subdivision (c)/(e)(1), which provides an additional determinate term of 20 years imprisonment.  As to those counts, the court also imposed and stayed terms of 10 years imprisonment under section 12022.53, subdivisions (b)/(e)(1).  On counts 4 and 9, the court properly imposed and stayed terms of 20 and 10 years for the lesser firearm enhancements (§ 12022.53, subds. (b)-(c)/(e)(1)).

sentence on count 3 (first degree murder of Ormoni Duncan) without indicating whether the sentences were to run consecutively or concurrently to count 2. On counts 4 and 9 (attempted premeditated murders of Janell Lipkin and Shamark Wright), the court sentenced appellants Robinson and Barnes to consecutive terms of life imprisonment, plus 25 years to life for the firearm enhancement. On count 5 (shooting at an inhabited dwelling), the court sentenced appellants to consecutive upper terms of seven years, and imposed and stayed a term of 25 years to life for the firearm enhancement. On count 1, the court imposed and stayed a term of 25 years to life for the underlying offense, plus 10 years, 20 years, and 25 years to life for the three firearm enhancements (§ 12022.53, subds. (b)-(d)/(e)(1)).[34]

The court continued: "Okay. With regard to factors in aggravation, . . . The court does impose the consecutive sentences pursuant to rules of court 4.425 in that separate acts of violence against separate victims were alleged here." The court also stated that the victims were particularly vulnerable; the manner in which appellants Robinson and Barnes committed the crimes indicated planning and sophistication; and appellants had criminal records.

The sentencing minute orders reflect the court's oral imposition of sentence. The orders also provided that the sentences imposed on count 3 as to both appellants were fully consecutive.[35]

---

[34] As to appellant Robinson, the court imposed a consecutive term of five years on count 4, and imposed and stayed a five-year term on counts 5 and 9 based on his prior serious felony conviction (§ 667, subd. (a)(1)).

[35] The minute orders for both appellants states as follows: "As to count three: . . . section 187(a) first degree willful, deliberate and premeditated murder pursuant to special circumstances, . . . sections 190.2(a)(3), 190.2(a)(21), and 190.2(a)(22), three consecutive sentences to life without the possibility of parole; plus an additional 25 years to life pursuant to . . . section 12022.53(d)/(e), consecutive."

II.   *Assembly Bill No. 333*

On appeal, appellants Lee and Robinson asked for leave to file supplemental briefing regarding the impact of newly enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (A.B. 333).  (See Stats. 2021, ch. 699, §§ 1-5.) A.B. 333 expressed concern that former section 186.22 sometimes applied to "social networks of residents in neighborhoods" who were "often mischaracterized as gangs despite their lack of basic organizational requirements."  (Stats. 2021, ch. 699, § 2, subd. (d)(8); see *id.*, § 2, subd. (d)(7) ["People frequently receive gang enhancements based on the conduct of other people whom they have never even met"].)

To address this concern, A.B. 333 amended section 186.22 to require proof of additional elements to establish a gang enhancement.  A.B. 333 also added section 1109 to the Penal Code, which provides that "[i]f requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases." (§ 1109, subd. (a).)  We granted appellants' requests, received briefing from the parties, and now consider the arguments as to all three appellants.

a.  *Sections 186.22 and 12022.52*

Appellants contend, and the Attorney General agrees, that the amendments to section 186.22 should be applied retroactively to the gang enhancement and gang-related firearm enhancements (§§ 186.22, 12022.53, subds. (b)-(d)/(e)(1)) in this case, and that under the new law, there is insufficient evidence to support imposition of those enhancements.  They ask that we strike the true findings on these allegations and remand the matter to afford the prosecution the opportunity to retry the allegations.

63

We agree that the amendments to section 186.22 apply retroactively in this case. Section 186.22 provides for an enhanced punishment when the defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) A.B. 333's amendments to section 186.22 apply retroactively to cases like the one here, in which the judgments of conviction have not become final prior to the effective date of A.B. 333. (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 343–344 (*Lopez*); *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 (*E.H.*); *People v. Figueroa* (1993) 20 Cal.App.4th 65, 68, 70–71.)

We also agree that the amendments require the reversal of the gang enhancements under section 186.22; the gang-related firearm enhancements under section 12022.53, subdivisions (d)/(e)(1), (c)/(e)(1), and (b)/(e)(1); and, despite the Attorney General's argument raised by supplemental brief (which we discuss in the next section below), the gang-murder special circumstance findings under section 190.2, subdivision (a)(22). Prior to the amendments made by A.B. 333, a "criminal street gang" was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) A "'pattern of criminal gang activity'" was defined as "the commission of . . . two or more of [the enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a

64

prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Former § 186.22, subd. (e).)

Consistent with former section 186.22, the court instructed the jury in this case on the gang enhancement, and informed the jury that "[t]he crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related." (See CALCRIM No. 1401.)

While this appeal was pending, A.B. 333, which became effective January 1, 2022, modified the definition of a "criminal street gang" to "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Current § 186.22, subd. (f), italics added.) A.B. 333 also redefined "'pattern of criminal gang activity'" to mean "the commission of . . . two or more [enumerated criminal acts], provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, *the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational.*" (Current § 186.22, subd. (e)(1), italics added.)

"Thus, pursuant to the new legislation, imposition of a gang enhancement [now] requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three

years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense." (*Lopez, supra*, 73 Cal.App.5th at p. 345, quoting § 186.22, subds. (e)(1)-(2).) The statute also sets forth examples "of a common benefit that are more than reputational," which include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

We must vacate the jury's true findings on the gang enhancement (§ 186.22, subd. (b)(1)(C)), gang-related firearm enhancements (§ 12022.53, subds. (d)/(e)(1), (c)/(e)(1), (b)/(e)(1)), and gang-murder special circumstance (§ 190.2, subd. (a)(22)), as the absence of the new elements under the gang statute is not harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Under *Chapman,* "the absence of instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt that the error did not contribute the th[e] jury's verdict.' (*People v. Flood* (1998) 18 Cal.4th 470, 504.)" (*E.H., supra*, 75 Cal.App.5th at p. 479; *People v. Sek* (2022) 74 Cal.App.5th 657, 668–670; see *People v. Merritt* (2017) 2 Cal.5th 819, 826–831 [instructional error involving the omission of multiple elements subject to harmless error review].)

Here, to prove DDC was a criminal street gang under former section 186.22, the prosecution submitted evidence that two known DDC gang members (La'Shaun Morgan and Shawn Lyndolph) were each convicted of felon in possession of a firearm (§ 29800, subd. (a)(1)) in 2013 and 2016. Consistent with current section 186.22, however, the prosecution did not introduce evidence that those predicate offenses commonly benefited DDC, or

that the common benefit of either crime was more than reputational. Nor was the jury was instructed to determine this additional element under section 186.22; it instead was instructed that it need not find either predicate offense gang-related. Thus, on this record, we cannot conclude beyond a reasonable doubt that the omission of the new elements in section 186.22 did not contribute to the jury's verdict. The true findings under section 186.22 must be vacated, and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amended law. (*Lopez*, *supra*, 73 Cal.App.4th at p. 346; accord, *E.H.*, *supra*, 75 Cal.App.5th at p. 480.)

The changes wrought by A.B. 333 also require that we vacate the firearm enhancement and gang-murder special circumstance findings in this case (§§ 12022.53, subds. (b)-(d)/(e)(1), 190.2, subd. (a)(22)). Every true finding on the firearm enhancement allegations that the jury made was based on subdivision (e)(1) of section 12022.53, which provides that the court may impose additional sentences listed in subdivisions (b) through (d) if two conditions are found to be true: (1) the defendant was a principal in the underlying crime and violated section 186.22, subdivision (b); and (2) any principal in the offense committed any act listed in subdivisions (b) through (d) in section 12022.53. Section 190.2, subdivision (a)(22) requires proof beyond a reasonable doubt that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

The express reliance by both the firearm enhancement statutes and gang-murder special circumstance statutes on the definition of a criminal street gang in section 186.22 means that appellants are entitled to the benefit

of this change in the law as to every special circumstance and sentence enhancement finding under sections 12022.53, subdivisions (b)/(e)(1), (c)/(e)(1), and (d)/(e)(1), and 190.2, subdivision (a)(22). (*Lopez*, *supra*, 73 Cal.App.5th at pp. 347.)

b.      *Section 190.2, subdivision (a)(22)*

The Attorney General contends that while AB 333's amendments apply retroactively to the gang and gang-related firearm enhancement findings (§§ 186.22, 12022.53), those amendments do not apply to the gang-murder special circumstance findings (§ 190.2, subd. (a)(22)). We disagree.

The Attorney General's contention runs as follows. The gang-murder special circumstance, section 190.2, subdivision (a)(22), was enacted by the voters as section 11 of Proposition 21 on the March 7, 2000 ballot. (See *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 897.) Under the California Constitution, an initiative statute can be amended "only when approved by the electors unless the initiative statute permits amendment or repeal without [the electors'] approval." (Cal. Const., art. II, § 10, subd. (c); accord, *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 568 (*Pearson*); *People v. Kelly* (2010) 47 Cal.4th 1008, 1025.) Proposition 21 does not permit amendment without the electors' approval or by legislative amendment passed by two-thirds vote in each house. (Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 39, p. 131 ["[t]he provisions of this measure shall not be amended by the Legislature except by a statute passed in each house by . . . two-thirds of the membership of each house concurring, or by a statute that becomes effective only when approved by the voters"].) A.B. 333 was enacted without voter approval, and without the requisite two-thirds votes in both houses of the Legislature. (See Sen. Daily J. (2021-2022 Reg. Sess.)

68

p. 2284; Assem. Daily J. (2021-2022 Reg. Sess.) p. 2927.) Accordingly, the Attorney General asserts that the Legislature lacked the power to unilaterally repeal or amend provisions of the initiative through A.B. 333.

According to the Attorney General, insofar as AB 333 seeks to redefine the definition of a "criminal street gang" in the voter-enacted gang-murder special circumstance, it runs afoul of the constitutional prohibition on legislative amendment of a statute adopted by initiative. The Attorney General relies on a general principle of statutory construction: "'where a statute adopts by specific reference the provisions of another statute . . . such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified.'" (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58–59; see *In re Oluwa* (1989) 207 Cal.App.3d 439, 445.) As enacted by section 11 of Proposition 21, the gang-murder special circumstance (§ 190.2, subd. (a)(22)) applies to any intentional killing committed by the defendant, if at the time he or she "was an active participant in *a criminal street gang, as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang." (Ballot Pamp., *supra*, text of Prop. 21, § 11, p. 122, italics added.) The Attorney General contends that the italicized reference to section 186.22, subdivision (f) reflects an intent to incorporate that provision in the form in which it existed at the time Proposition 21 was adopted, and not as the provision might subsequently be modified. Thus, according to the Attorney General, AB 333's amendments to section 186.22, subdivision (f), which changed the definition of a criminal street gang, cannot constitutionally be applied to amend section 11 of Proposition 21.

However, the rule of statutory construction on which the Attorney General relies is not to be mechanically applied. (See *In re Jovan B.* (1993) 6

69

Cal.4th 801, 816, fn. 10 (*Jovan B.*) ["Several modern decisions have applied the *Palermo* rule, but none have done so without regard to other indicia of legislative intent"]; *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1505 ["the *Palermo* rule is not to applied in a vacuum"].) Rather, "where the words of an incorporating statute do not make clear whether it contemplates only a time-specific incorporation, 'the determining factor will be . . . legislative intent . . . .'" (*Jovan B.*, *supra*, at p. 816, quoting *People v. Domagalski* (1989) 214 Cal.App.3d 1380, 1386.) We conclude that in enacting Proposition 21, the voters did not contemplate a time-specific incorporation of the then-current version of section 186.22, subdivision (f), into the gang-murder special circumstance statute.

When interpreting an initiative, we "first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*Pearson*, *supra*, 48 Cal.4th at p. 571.) "Finally, we presume that the 'adopting body' is aware of existing laws when enacting a ballot initiative." (*Gonzales*, *supra*, 6 Cal.5th at p. 50.)

The Attorney General's contention posits an odd mix of intentional choices made by the electorate in the application of section 186.22, subdivision (f). Section 186.22 was originally enacted by the

70

Legislature in 1987. (*People v. Albillar* (2010) 51 Cal.4th 47, 56–57, citing Sen. Bill No. 1555, as amended May 22, 1987, § 1, pp. 10–11.) As part of Proposition 21, in March 2000 the electorate amended certain provisions of section 186.22 by increasing the sentences of the gang enhancements provided by subdivisions (b), (c), and (d). (Ballot Pamp., *supra*, text of Prop. 21, § 4, pp. 119–120.) The electorate also updated the list of predicate offenses to be used to determine a "pattern of criminal gang activity" in subdivision (e). However, the voters reenacted section 186.22, subdivision (f) without substantive change. (See Ballot Pamp., *supra*, text of Prop. 21, § 4, pp. 119–120.) As such, subdivision (f) of section 186.22 cannot be deemed "among the initiative's statutory provisions" made immune from legislative amendment by force of article II, section 10 of the State Constitution. (*People v. Superior Court (Ferraro)* (2020) 51 Cal.App.5th 896, 915; accord, *People v. Nash* (2020) 52 Cal.App.5th 1041, 1064–1065 (*Nash*); *People v. Johns* (2020) 50 Cal.App.5th 46, 65–66.)

In short, the voters left intact the Legislature's power to amend the definition of a criminal street gang in section 186.22, subdivision (f). (See *County of San Diego v. Commission* (2018) 6 Cal.5th 196, 214; *People v. Prado* (2020) 49 Cal.App.5th 480, 485.) According to the Attorney General, however, the voters did not intend to permit any future amendment of that provision to be incorporated into the gang-murder special circumstance.

It is difficult to discern a rational reason for such an anomalous choice, and we find no basis to conclude that the electorate made it.[36] In enacting

---

[36] The Attorney General concedes that his interpretation of the gang murder special circumstance will cause "considerable confusion" in application. A jury will have to apply one definition of a criminal street gang for the sentence enhancements under section 186.22, and another definition for purposes of determining whether the defendant is eligible for capital

71

Proposition 21, the electorate clearly knew how to express the intent to freeze a statutory definition. In sections dedicated to amending portions of the Three Strikes law, Proposition 21 changed the "'lock-in' date for determining the existence of qualifying offenses (such as violent or serious felonies)" under the Three Strikes law. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 574.) In two of those sections, Proposition 21 provided that "for all offenses committed on or after the effective date of this act, all references to existing statutes in [§§ 667, subds. (c) to (g), and 1170.125] are to those statutes *as they existed on the effective date of this act, including amendments made to those statutes by this act*." (Ballot Pamp., *supra*, text of Prop. 21, §§ 14, 16, pp. 123–124, italics added; see former §§ 667.1, 1170.125.) Given the express time-specific incorporations in sections 14 and 16 of Proposition 21, we may safely assume that had the voters also intended section 11 of Proposition 21 to make a time-specific incorporation of section 186.22, subdivision (f), they would "have said so in readily understood terms." (*People v. Frawley* (2000) 82 Cal.App.4th 784, 796.) But there is no such language. There is simply no basis to believe that the voters understood they were precluding future amendments of subdivision (f) of section 186.22 as referred to in the gang-murder special circumstance, while permitting such future amendments for section 186.22 itself.

_____

punishment under section 192, subdivision (a)(22). Indeed, the definition of a criminal street gang applied for purposes of the gang sentence enhancements would be narrower than that applied to the special circumstance. Thus, anomalously, for the same gang-related criminal conduct in which a killing occurs, a defendant could be found not to qualify for the lesser gang sentence enhancements, but nonetheless found to qualify for capital punishment.

Furthermore, applying AB 333's amendments to the gang murder special circumstance is fully consistent with the purpose of Proposition 21. "An amendment is a legislative act designed to change an existing initiative statute by adding or taking from it some particular provision." (*People v. Cooper* (2002) 27 Cal.4th 38, 44.) "But this does not mean that any legislation that concerns the same subject matter as an initiative, or even augments an initiative's provisions, is necessarily an amendment for these purposes. 'The Legislature remains free to address a '"related but distinct area"' [citations] or a matter that an initiative measure "does not specifically authorize *or* prohibit."' [Citations.]" (*Pearson, supra*, 48 Cal.4th at p. 571.) In deciding whether a particular legislative act amends an initiative statute, courts "need to ask whether it prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*Ibid.*) Here, A.B. 333 neither prohibits what section 11 of Proposition 21 authorizes nor authorizes what section 11 of Proposition 21 prohibits. (*Pearson, supra*, 48 Cal.4th at p. 571.)

In the March 7, 2000 Ballot Pamphlet, Proposition 21 was entitled the "Gang Violence and Juvenile Crime Prevention Act of 1998." It declared in relevant part that "[g]ang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity." (Ballot Pamp., *supra*, text of Prop. 21, § 2, subd. (h), p. 119.)[37] Thus, the initiative was

---

[37] More fully, the Attorney General's summary in the ballot pamphlet stated, inter alia, that Proposition 21 "[i]ncreases punishment for gang-related felonies," imposes "death penalty for gang-related murder," and "[d]esignates additional crimes as violent and serious felonies, thereby making offenders subject to longer sentences." (Ballot Pamp., *supra,* official title and summary of Prop. 21, p. 44.)

aimed in pertinent part at increasing the sentences for "gang-related" felonies and murder. There was no distinction suggesting that what constitutes a "gang-related" murder was frozen in time for section 190.2, subdivision (a)(22), but what constitutes a "gang-related" felony for section 186.22 was not. (See *People v. Caudillo* (1978) 21 Cal.3d 562, 585 ["[i]t is an established rule of statutory construction that similar statutes should be construed in light of one another"], overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225.)

Further, applying A.B. 333 to section 190.2, subdivision (a)(22)'s reference to section 186.22, subdivision (f), does not change the punishment for "murderers who kill as part of any gang-related activity," the relevant purpose of Proposition 21. (Ballot Pamp., *supra*,

---

The Legislative Analyst's summary stated in relevant part: "This measure makes various changes to laws specifically related to . . . adults who are gang-related offenders, and those who commit violent and serious crimes. Specifically, it: [¶] . . . [¶] Increases penalties for gang-related crimes and requires convicted gang members to register with local law enforcement agencies[, and] [¶] [i]ncreases criminal penalties for certain serious and violent offenses." (*Id.*, analysis of Prop. 21 by Legis. Analyst, p. 45.) After setting forth the then-current law defining "'gangs' as any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of certain crimes," the Legislative Analyst reported that Proposition 21 "adds gang-related murder to the list of 'special circumstances' that make offenders eligible for the death penalty." (*Id.*, analysis of Prop. 21 by Legis. Analyst, p. 46.)

The following excerpt appears under the title, "What Your Vote Means" in the Ballot Measure Summary: "A YES vote on this measure means [v]arious changes will be made to juvenile and adult criminal law. Among the more significant changes, it . . . increases penalties for gang-related crimes." (Voter Information Guide, Prim. Elec. (Mar. 7, 2000) ballot measure summary of Prop. 21.)

text of Prop. 21, § 2, subd. (h), p. 119.)  It simply refines the concept of what constitutes a "gang-related" murder.  Defendants deemed to have committed first degree murder while actively participating in a gang still remain eligible for capital punishment.  (See *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 281 [requisite elements of an offense and punishment for that offense are separate and distinct concepts]; see also *People v. Solis* (2020) 46 Cal.App.5th 762, 779; *Nash*, *supra*, 52 Cal.App.5th at p. 1059.)

The legislative purpose of A.B. 333 also does not offend the voter's intent in passing Proposition 21.  In enacting A.B. 333, the Legislature declared that in practice, under the original definition of a criminal street gang in section 186.22, subdivision (f), "[t]he social networks of residents in neighborhoods targeted for gang suppression are often mischaracterized as gangs despite their lack of basic organizational requirements such as leadership, meetings, hierarchical decisionmaking, and a clear distinction between members and nonmembers." (Stats. 2021, ch. 699, § 2, subd. (d)(8).)  Further, the Legislature concluded that "[p]eople are also frequently automatically lumped into a gang social network simply because of their family members or their neighborhood."  (*Id.*, § 2, subd. (d)(9).)  That is, in practice the original definition of a criminal street gang was not narrowly focused on punishing true gang-related crimes.  Thus, in A.B. 333, the Legislature redefined the term "criminal street gang" so as to truly target the population of criminals for which an enhanced punishment is warranted.

In sum, amendment of the definition "criminal street gang" by A.B. 333 does not prohibit what Proposition 21 authorized, or authorize what Proposition 21 prohibited.  We find nothing to suggest that the electorate intended to impose a time-specific incorporation of the term "criminal street

75

gang" in the gang-murder special circumstance statute.  Thus, we conclude that the term "criminal street gang" as incorporated in the gang-murder special circumstance statute was "intended to conform at all times" and "remain permanently parallel" to section 186.22.  (*Jovan B.*, *supra,* 6 Cal.4th at p. 816 & fn. 10.)  As to all appellants, we vacate the gang enhancement allegation findings (§ 186.22, subd. (b)(1)(C)), gang-related firearm use enhancements findings (§ 12022.53, subds. (b)-(d)/(e)(1)), and gang-murder special circumstance findings (§ 190.2, subd. (a)(22)).  We also strike the sentences imposed under these findings, and remand the matter to afford the People the opportunity to retry these allegations under the current law.

### c. *Section 1109*

As enacted by A.B. 333, section 1109 provides in relevant part that "[i]f requested by the defense," the trial court shall bifurcate a gang enhancement charged under subdivision (b) of section 186.22 from the underlying charges. (§ 1109, subd. (a).)  The court shall then try the matter "in separate phases" by first adjudicating the question of the defendant's guilt of the underlying offenses; and if the defendant is found guilty of any offense, the court shall then hold "further proceedings to the trier of fact on the question of the truth of the [gang] enhancement."  (§ 1109, subds. (a)(1)-(2).)

Appellants contend that section 1109 applies retroactively to this case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), and is a separate ground for reversing the gang findings and his convictions.  We agree with the Attorney General that the exception provided in *Estrada* does not apply to section 1109, and the statute does not apply retroactively to this appeal.

Our Supreme Court has explained that *Estrada* "established an exception to the general rule that no part of the Penal Code is retroactive.

76

(§ 3 [no part of the Pen. Code is retroactive 'unless expressly so declared'];
[citation].)  In *Estrada,* we held that 'where [an] amendatory statute
mitigates punishment and there is no saving clause, the rule is that the
amendment will operate retroactively so that the lighter punishment is
imposed.' [Citation.]  [¶]  . . .  *Estrada* represents 'an important, contextually
specific qualification to the ordinary presumption that statutes operate
prospectively:  When the Legislature has amended a statute to reduce the
punishment for a particular criminal offense, we will assume, absent
evidence to the contrary, that the Legislature intended the amended statute
to apply to all defendants whose judgments are not yet final on the statute's
operative date.' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144,
1195–1196 (*Hajek*), overruled on another ground in *People v. Rangel* (2016)
62 Cal.4th 1192.)

In other words, the *Estrada* presumption applies whenever an
amended statute mitigates or eliminates punishment for a criminal offense or
enhancement.  (*People v. Buycks* (2018) 5 Cal.5th 857, 882; *Estrada*, *supra*,
63 Cal.2d at pp. 743–744; *Hajek*, *supra*, 58 Cal.4th at p. 1196; see also *People
v. Wright* (2006) 40 Cal.4th 81, 95–96 [*Estrada* applied to statute creating a
new affirmative defense]; *People v. Babylon* (1985) 39 Cal.3d 719, 721–722,
728 [statute narrowing class of prohibited acts]; *In re David C.* (2020) 53
Cal.App.5th 514, 519 [bill that "ameliorated the possible punishment for a
class of persons"].)

Here, section 1109 does not reduce or eliminate punishment for an
offense or enhancement, provide a new affirmative defense to a charged
crime, or otherwise ameliorate the punishment for a class of individuals.  The
statute modifies trial procedures for defendants who have been charged with
a gang enhancement, and choose to invoke section 1109.  When used in an

appropriate case, section 1109 will only require adjudication on the question of a defendant's guilt of an underlying offense before further adjudicating "the question of the truth of the [gang] enhancement." (§ 1109, subds. (a)-(b).) The *Estrada* presumption does not apply to this type of procedural rule. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 65; *People v. Perez* (2022) 78 Cal.App.5th 192, 207; *People v. Burgos* (2022) 77 Cal.App.5th 550, 569–575 (*Burgos*) (dis. opn. of Elia, J.); accord, *People v. Cervantes* (2020) 55 Cal.App.5th 927, 940; *People v. Hayes* (1989) 49 Cal.3d 1260, 1274; but see *Burgos*, *supra*, at pp. 568–569 (maj. opn. of Greenwood, P. J.).)

Beyond *Estrada*, we discern nothing in A.B. 333's legislative history representing an express declaration of retroactivity, or "'a clear and compelling implication'" that section 1109 should apply retroactively to cases that are not final at the time the statute was enacted.[38] (*People v. Alford*

---

[38] The uncodified declarations in A.B. 333 provide that gang evidence "can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (Stats. 2021, ch. 699, § 2(d)(6).) However, the introduction to A.B. 333 discusses section 1109 in the context of criminal defendants who are presently charged with participating in a criminal street gang: the bill "would require, if requested by the defense in a case where a sentencing enhancement for participation in a criminal street gang is charged, that the defendant's guilt of the underlying offense first be proved and that a further proceeding on the sentencing enhancement occur after a finding of guilt."

The legislative history also discussed the effects of section 1109 on charges in a criminal prosecution, future dispositions, and the imposition of prison terms shorter "than what would be imposed under the existing determinate sentencing law." (Sen. Comm. on Appropriations, Analysis on Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended July 13, 2021, p. 1; accord, Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended July 13, 2021, pp. 5–6.) We have found nothing in the legislative history of A.B. 333 discussing

(2007) 42 Cal.4th 749, 753.) We therefore conclude that because the exception in *Estrada* does not apply to section 1109, the statute operatives prospectively only and is not an independent ground for reversal of the gang related findings or appellants' convictions.

III.    *Senate Bill No. 567*

On October 8, 2021, while this appeal was pending, the Governor signed S.B. 567, which amends section 1170, subdivision (b). As amended, section 1170 now requires that a trial court impose the middle term for any offense with a sentencing triad unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) Nevertheless, the court may "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

At the time appellants were sentenced (July 2019 and March 2020), the trial court had the discretion under section 1170 to choose the lower, middle, or upper term from a sentencing triad that "best serve[d] the interests of justice." (Former § 1170, subd. (b).) When choosing a term, the court could rely on "the record in the case, the probation officer's report, other reports . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is

the effect of section 1109 on defendants who have already been convicted, but whose judgments would not be final on the bill's operative date.

deceased, and any further evidence introduced at the sentencing hearing." (*Ibid.*) The court could also consider the aggravating and mitigating circumstances set forth in rules 4.421 and 4.423. Consistent with these principles, the trial court in this case selected the upper term on count 5 as to all three appellants.

By supplemental briefing, appellants Lee, Robinson, and Barnes contend that S.B. 567's recent amendment to section 1170, subdivision (b), applies retroactively and requires remand for resentencing on count 5 (shooting at an inhabited dwelling). (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; see *People v. Frahs* (2020) 9 Cal.5th 618, 627–630.) The Attorney General concedes that because change in the law applies retroactively to this case, all three appellants may raise this issue in the trial court on remand. We accept the Attorney General's concessions and agree that we need not address the issue in the first instance. (See *Dix v. Superior Court* (1991) 53 Cal.3d 442, 460 ["it is well settled that when a case is remanded for resentencing after an appeal, the defendant is entitled to . . . consideration of any pertinent circumstances which have arisen since the prior sentence was imposed"].) We vacate the sentences imposed on counts 5, and remand for resentencing.

IV.    *The Sentences on Count 3 are Consecutive to Count 2*

Appellants Robinson and Barnes contend that the trial court's failure to use the word "consecutive" when imposing their sentences on count 3 means that the sentences are concurrent as a matter of law. We disagree.

When a defendant is convicted of two or more crimes, "the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment . . . shall run concurrently or

consecutively." (§ 669, subd. (a).) "Upon the failure of the court to determine how the terms of imprisonment on the second or subsequent judgment shall run, the term of imprisonment on the second or subsequent judgment shall run concurrently." (§ 669, subd. (b); see *People v. Black* (2007) 41 Cal.4th 799, 822 [§ 669 "provides for a default" if the court does not impose a consecutive sentence].) The sentencing court has discretion in making its sentencing choices, and must only "'state in simple language the primary factor or factors that support the exercise of discretion.' ([R]ule 4.406(a).)" (*People v. Sandoval* (2007) 41 Cal.4th 825, 851.)

Here, the record reveals the court's intent to sentence appellants Robinson and Barnes to consecutive sentences on count 3. During the sentencing hearing, the court indicated it would be sentencing appellants to "multiple" terms of life imprisonment without the possibility of parole, and consecutive sentences for crimes involving separate victims. Counts 2, 3, 4, and 9 all involve separate victims; of those counts, counts 2 and 3 carry a term of life imprisonment without the possibility of parole. Moreover, the minute orders for appellants Barnes and Robinson reflect consecutive indeterminate sentences on count 3. The court's statements and the sentencing minute orders amply demonstrate that the court elected to impose consecutive sentences on count 3.

Appellants have furnished no authority (and we are aware of none) requiring a sentencing court to specify that a sentence is to run consecutively on every particular count. The authorities on which appellants rely do not require the sequential declaration of consecutive sentences; they simply require a clear indication of a court's decision to impose consecutive sentences in a given case. (See *People v. Downey* (2000) 82 Cal.App.4th 899, 913–914;

*People v. Caudillo* (1980) 101 Cal.App.3d 122, 125-126.) As we have discussed, that indication is clearly present in this case.

V.    *Multiple LWOP Sentences Imposed on Counts 2 and 3*

Appellants Barnes and Robinson contend, and the Attorney General concedes, that the sentencing minute orders must be corrected to reflect the imposition of one term of life imprisonment without the possibility for parole plus 25 years to life on counts 2 and 3. We agree, and note that the same applies with respect to appellant Lee on counts 2, 3, and 6.

As to all three appellants, the trial court erred by imposing three consecutive terms of life imprisonment without the possibility of parole on both counts 2 and 3. (See § 190.2, subd. (a) [penalty for first degree murder is death or life imprisonment without the possibility of parole "if one or more of the following special circumstances has been found . . . to be true"]; *People v. Montes* (2014) 58 Cal.4th 809, 874 [a defendant "face[s] no additional punishment merely as a result" of multiple special circumstance findings].)

The abstracts of judgment for all three appellants in this case correctly reflect one term of life imprisonment without the possibility of parole plus 25 years to life for the firearm enhancement on counts 2 and 3. The correct sentence on count 6 is also listed on appellant Lee's abstract of judgment. We direct the trial court to correct the minute orders as to all three appellants to properly reflect these sentences on counts 2, 3, and 6.

VI.    *Multiple-Murder Special Circumstance Findings*

Appellants Barnes and Robinson contend, and the Attorney General agrees, that the trial court erred by imposing a term of life imprisonment without the possibility of parole on both counts 2 and 3 based on the multiple

murder special circumstance (§ 190.2, subd. (a)(3)).  They request that we strike or vacate one of the special circumstance findings.  This issue also applies to appellant Lee on counts 2, 3, and 6.

The Supreme Court's remedy for cases in which numerous multiple-murder special circumstance allegations were charged and found true has been to "stri[ke] the superfluous finding and conclude[] the defendant suffered no prejudice."  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422; *People v. Zamudio* (2008) 43 Cal.4th 327, 363; accord, *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 49 [vacating one of two multiple-murder special circumstance finding for each defendant].)

Consistent with these decisions, we vacate the multiple-murder special circumstance finding for each appellant on count 3.  We also vacate the multiple-murder special-circumstance finding on count 2 with respect to appellant Lee only.  The section 190.2, subdivision (a)(3) enhancement shall be imposed on count 2 for appellants Barnes and Robinson, and on count 6 for appellant Lee.

VII. *Errors in Abstracts of Judgment (Counts 4 and 9)*

On counts 4 and 9 (attempted premeditated murder of Janell Lipkin and Shamark Wright), appellant Lee was sentenced to a term of life imprisonment with the possibility of parole, which the court purported to double under section 1170.12, plus 25 years to life for the firearm enhancement, and five years for the prior serious felony conviction enhancement.  The court did not orally impose a minimum term of parole eligibility on either count.  After reviewing the record on appeal, we requested briefing on the issue whether appellant Lee's abstract of judgment incorrectly omitted a minimum term of parole eligibility on both counts of

attempted premeditated murder.  By supplemental letter briefs, appellant Lee and the Attorney General agree that his abstract of judgment should be corrected to reflect a minimum term of parole eligibility.  (See *People v. Jefferson* (1999) 21 Cal.4th 86, 92–96, 99–102 (*Jefferson*).)  We agree with the parties, and note that the court did not orally impose a minimum term of parole eligibility for appellants Robinson and Barnes.

Those "imprisoned under a life sentence shall not be paroled until he or she has served the greater of" a term of at least seven calendar years, or a term as established pursuant to any other law establishing a minimum term of confinement under a life sentence before eligibility for parole.  (§ 3046, subd. (a).)  As relevant here, "any other law establishing a minimum term of confinement" for each appellant's life sentences on counts 4 and 9 is section 186.22, subdivision (b)(5), which establishes a minimum confinement period of 15 years for the commission of attempted premeditated murder while violating the gang enhancement statute under section 186.22, subdivision (b)(1).  (*Jefferson, supra,* 21 Cal.4th at p. 96.)

We have vacated and stricken the gang-related enhancement allegations and sentences (see our discussion at section G.II.a. *ante*), and remand for the People to decide whether to retry appellants on the gang-related allegations.  Assuming the People decide not to retry the allegations, the court must impose minimum terms of parole eligibility on counts 4 and 9 as to each appellant as follows: as to appellants Robinson and Barnes, a term of parole eligibility of seven years on each count (§ 3046); as to appellant Lee, a minimum term of parole eligibility of 14 years on each count (§ 667, subd. (e)(1), 3046).  However, if the People elect to retry the gang enhancement allegations, and those allegations are to be found true (i.e., that appellants committed the attempted murders on counts 4 and 9 while violating current

§ 186.22, subd. (b)(1)), the minimum terms of parole eligibility to be imposed would be (under the current law) as follows: as to appellants Robinson and Barnes, a minimum term of parole eligibility of 15 years on each count (§ 186.22, subd. (b)(5)); as to appellant Lee, a minimum term of parole eligibility of 30 years on each count (§ 667, subd. (e)(1); 186.22, subd. (b)(5); see *Jefferson*, *supra*, 21 Cal.4th at p. 101 [alternate penalty provision in former § 186.22, subd. (b)(4) subject to sentence-doubling under the Three Strikes law].)

Moreover, appellants Robinson and Barnes correctly note that their abstracts of judgment improperly reflect consecutive sentences of 25 years to life on counts 4 and 9. On remand, the court shall prepare amended abstracts of judgment as to both appellants to correctly reflect consecutive sentences of life imprisonment with a minimum term of parole eligibility of seven years on each count. As to each count, the abstracts must also omit the terms of 25 years to life under the gang-related firearm enhancement (§ 12022.53, subd. (d)/(e)(1)). (*People v. Jones* (2012) 54 Cal.4th 1, 89; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

VIII. *Appellant Barnes is Entitled to Additional Custody Credit*

Appellant Barnes and the Attorney General agree that he is entitled to one additional day of actual custody credit. We accept the concession.

Appellant Barnes was arrested June 1, 2017, and sentenced March 5, 2020. As of the date of sentencing, he had served a total 1,009 days in jail (not 1,008 days as specified in the abstract of judgment). (See § 2900.5, subd. (a); *People v. Taylor* (2004) 119 Cal.App.4th 628, 647; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469.) The trial court is directed to prepare an

amended abstract of judgment to reflect a total of 1,009 days of custody credit.

## DISPOSITION

As to appellant Lee, on counts 1 through 6 and 9, we vacate the true findings on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (b)-(d)/(e)(1)), and strike the related sentences. On counts 2 and 3, we vacate the true findings on the multiple-murder special circumstance allegations (§ 190.2, subd. (a)(3)). We also vacate the sentence on count 5.

As to appellants Robinson and Barnes, on counts 1 through 5 and 9, we vacate the true findings on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (b)-(d)/(e)(1)), and strike the related sentences. As to both appellants Robinson and Barnes, on count 3, we vacate the true finding on the multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)). As to both appellants Robinson and Barnes, we also vacate the sentences imposed on count 5.

The case as to all three appellants is remanded to the superior court. On remand, the People shall decide whether to retry appellants on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (b)-(d)/(e)(1)). If the People elect not to retry these allegations, the superior court is directed to resentence appellants as follow. On counts 4 and 9, appellant Lee shall be sentenced to

a term of life imprisonment with a minimum term of parole eligibility of 14 years (§§ 667, subd. (e)(1), 3046), plus a consecutive term of five years (§ 667, subd. (a)(1)). On count 4, appellant Robinson shall be sentenced to a term of life imprisonment with a minimum term of parole eligibility of seven years (§ 3046), plus a consecutive term of five years (§ 667, subd. (a)(1)), and on count 9 he shall be sentenced to a term of life imprisonment with a minimum term of parole eligibility of seven years (§ 3046). On counts 4 and 9, appellant Barnes shall be sentenced to a term of life imprisonment with a minimum term of parole eligibility of seven years (§§ 664, subd. (a), 3046). The court shall resentence each appellant individually on count 5 in accordance with S.B. 567.

If the People decide to retry appellants on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (b)-(d)/(e)(1)), and if any such allegations are found true, the court shall resentence appellants according to applicable law.

Upon determination as to the status of these allegations (no retrial, or retrial and final resolution), the clerk of the superior court shall prepare an amended abstract of judgment for each appellant reflecting the appropriate modifications, as set forth above, and forward it to the California Department of Corrections and Rehabilitation. In addition, the clerk shall make the following additional changes.

As to appellant Lee, the clerk shall correct the sentencing minute orders to reflect one term of life imprisonment without the possibility of parole on both counts 2 and 3 pursuant to section 190.2, subdivision (a)(21), and one term of life imprisonment without the possibility of parole on count 6 pursuant to section 190.2, subdivisions (a)(3).

As to appellant Robinson, the clerk shall correct the sentencing minute orders to reflect one term of life imprisonment without the possibility of parole on count 2 pursuant to section 190.2, subdivisions (a)(3) and (a)(21), and one term of life imprisonment without the possibility of parole on count 3 pursuant to section 190.2, subdivision (a)(21).

As to appellant Barnes, the clerk shall amend the abstract of judgment to reflect 1,009 days of custody credit.

As modified, the judgment as to each appellant is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                    WILLHITE, J.
We concur:


MANELLA, P. J.


COLLINS, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DERION DAVON LEE et al.,<br><br>    Defendants and Appellants. | B300756, B305493<br>(Los Angeles County<br> Super. Ct. No. GA101244)<br><br><br>ORDER GRANTING<br>PARTIAL PUBLICATION and<br>MODIFICATION |

THE COURT:*

    The opinion in the above-entitled matter filed on June 24, 2022, was not certified for publication in the Official Reports.  Good cause appearing, it is ordered that the opinion in the above entitled matter be partially published in the official reports.  Portions to be published include pages 1-3, up to footnote 2, G.II, Assembly Bill No. 333, subdivisions a. and b., and the DISPOSITION.

    On page 68, change the word "without" to "except by".

    There is no change in the judgment.

---

*MANELLA, P. J.        WILLHITE, J.        COLLINS, J.